# EXHIBIT A

LEXSEE



Analysis
As of: Apr 09, 2010

**LANSING MERCY AMBULANCE SERVICE, INC., a Michigan corporation; RODNEY PALMER; CHARLENE PALMER; TED SPENCER, Plaintiffs-Appellees, v. TRI-COUNTY EMERGENCY MEDICAL CONTROL AUTHORITY; CLINTON MEMORIAL HOSPITAL ASSOCIATION; EATON RAPIDS COMMUNITY HOSPITAL; HAYES GREEN BEACH MEMORIAL HOSPITAL CORPORATION; INGHAM MEDICAL CENTER; LANSING GENERAL HOSPITAL; MICHIGAN AFFILIATED HEALTHCARE SYSTEMS, INC.; EDWARD W. SPARROW HOSPITAL ASSOCIATION; SISTERS OF MERCY HEALTH CORPORATION, Defendants-Appellants, VERNICE DAVID ANTHONY, Director; MICHIGAN DEPARTMENT OF PUBLIC HEALTH, Defendants.**

No. 96-1495

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**1997 U.S. App. LEXIS 27805**

**October 3, 1997, Filed**

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Western District of Michigan. 93-00025. Enslen. 3-14-96.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, medical control authority and affiliates, appealed from an award of the United States District Court for the Eastern District of Michigan, which awarded plaintiff service providers attorney fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.S. § 1988, after partially granting summary judgment in favor of the service providers.

**OVERVIEW:** The Michigan Department of Public Health was directed to set up a medical control authority. The medical providers sought a ruling that the medical control authority did not have authority to impose fees on licensees, and that the unauthorized fees constituted deprivations of property without due process of law, in violation of the Fourteenth Amendment. The district court granted summary judgment in favor of the service providers on this issue and awarded attorney fees. On appeal, the court affirmed because a party may be entitled to attorney fees even when that party prevailed only one issue out of three under 42 U.S.C.S. § 1988. Further, the court found that the litigation materially altered the legal relationship between the parties and a fee was proper. The degree of success goes only to the amount of the fee. The court also affirmed the amount of attorneys fees awarded because the district court reviewed the time records of the attorney in detail. The court noted that the district court held that the unsuccessful claims in the first and second issues were sufficiently related to the third cause of action to be included in the award of attorney fees.

**OUTCOME:** The court affirmed the judgment awarding attorney fees to the service providers as a prevailing party. The court also affirmed the amount of attorney fees awarded.

**CORE TERMS:** attorney fees, prevailing party, summary judgment, prevailed, mandatory, fee award, abused, legal relationship, emergency, prevail, lawsuit, award of fees, medical services, abuse of discretion, reasonableness, declaratory, delegation, unrelated, protocols, expended, pendent, victory, authority to impose, injunctive relief, materially alters, important factor, similarly situated, hourly rate, supplemental, prevailing

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Reasonable Fees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Statutory Attorney Fee Awards*
[HN1]The Civil Rights Attorney's Fees Awards Act of 1976 provides that in any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. 42 U.S.C.S. § 1988(b).

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > General Overview*
[HN2]To be considered a "prevailing party," a plaintiff must be able to point to a resolution of a dispute which changes the legal relationship between itself and the defendant. The plaintiff therefore must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. A plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN3]The court reviews a district court's factual determination of whether a party "prevailed" for clear error, and any subsequent decision to award or deny attorney fees for an abuse of discretion.

*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Degree of Success*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Statutory Attorney Fee Awards*
[HN4]A party may be entitled to attorney fees even where that party has prevailed only on an issue pendent to a substantial constitutional issue under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.S. § 1988.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
[HN5]A court, when determining the reasonableness of an award of attorney fees, should begin the process by examining the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. The court should then exclude hours that are excessive, redundant, duplicative, or otherwise unnecessary. The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

**COUNSEL:** For LANSING MERCY AMBULANCE SERVICE, INC., CHARLENE PALMER, TED SPENCER, Plaintiffs - Appellees: Richard A. Cascarilla, Lansing, MI.

For RODNEY E. PALMER, CHARLENE PALMER, TED SPENCER, Plaintiffs - Appellees: Robert L. Fitzke, East Lansing, MI.

For TRI-COUNTY EMERGENCY MEDICAL CONTROL AUTHORITY, CLINTON MEMORIAL HOSPITAL ASSOCIATION, EATON RAPIDS COMMUNITY HOSPITAL, HAYES GREEN BEACH MEMORIAL HOSPITAL CORPORATION, INGHAM MEDI-

CAL CENTER, LANSING GENERAL HOSPITAL, MICHIGAN AFFILIATED HEALTHCARE SYSTEMS, INC., EDWARD W. SPARROW HOSPITAL ASSOCIATION, SISTERS OF MERCY HEALTH CORPORATION, Defendants - Appellants: Debra S. Hirsch, Kitch, Drutchas, Wagner & Kenney, Lansing, MI.

For VERNICE DAVID ANTHONY, MICHIGAN DEPARTMENT OF [*2] PUBLIC HEALTH, Defendants: Robert J. Taube, Office of the Attorney General of Michigan, Lansing, MI.

For MICHIGAN DEPARTMENT OF PUBLIC HEALTH, Defendant: Debra S. Hirsch, Kitch, Drutchas, Wagner & Kenney, Lansing, MI.

JUDGES: BEFORE: MARTIN, Chief Circuit Judge; RYAN and BATCHELDER, Circuit Judges.

OPINION BY: RYAN

OPINION

RYAN, Circuit Judge. Defendants, collectively referred to as TCEMCA, appeal from the district court's award of attorney fees entered in favor of plaintiffs, hereinafter referred to as "Mercy." Mercy previously filed a declaratory action which the district court disposed of by partially granting summary judgment for each party.

On appeal, TCEMCA claims the district court abused its discretion when it found Mercy to be a prevailing party and thus eligible to receive attorney fees under 42 U.S.C. § 1988. TCEMCA also claims the court abused its discretion in determining the amount of attorney fees it ultimately awarded. For the reasons that follow, we will affirm.

I.

Effective July 2, 1990, the Michigan legislature amended the Public Health Code by enacting provisions regulating emergency medical services. MICH. COMP. LAWS ANN. §§ 333.20901-20979 (West Supp. 1997). [*3] Those provisions directed the Michigan Department of Public Health (the MDPH) to set up a medical control authority (the LMCA) on a regional basis throughout the State. MICH. COMP. LAWS ANN. § 333.20910(1)(k) (West Supp. 1997). MDPH created the Tri-County Emergency Medical Control Authority (TCEMCA) to service Ingham, Eaton, and Clinton counties.

Beginning in 1992, Mercy unsuccessfully attempted to clarify the scope of TCEMCA's authority though a series of communications with TCEMCA and MDPH. The effort did not succeed and in due course Mercy filed

an action in federal court seeking declaratory and injunctive relief.

Mercy first sought a declaratory judgment that the delegation of governmental authority to the private entities that comprise the LMCA violated the Fourteenth Amendment to the United States Constitution by wrongfully allowing plaintiffs' business to be regulated by their competitors and by their customers. Mercy also sought an injunction against the enforcement of the emergency medical services section of the Public Health Code, including the related rules, regulations, and protocols. The district court granted summary judgment for TCEMCA on this issue.

Second, Mercy [*4] sought a ruling that the delegation of governmental authority to the LMCA through the emergency medical services section, Part 209 of the Public Health Code, and the promulgation of protocols applicable to the local geographic regions covered by the individual LMCAs, violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment because the delegation and local rule-making allegedly violated article IV, section 29 of the Michigan Constitution of 1963. The district court declined to exercise its pendent jurisdiction to address this claim.

Finally, Mercy sought a ruling that the LMCA does not have authority to impose or levy fees on licensees under Part 209 of the Public Health Code, and that the unauthorized fees therefore constitute deprivations of property without due process of law, in violation of the Fourteenth Amendment. The district court ultimately granted summary judgment in favor of Mercy on this issue.

Following entry of the summary judgment order, Mercy filed a motion with the district court seeking attorney fees pursuant to 42 U.S.C. § 1988. The court held that Mercy could be considered a prevailing party and awarded attorney fees. TCEMCA then filed [*5] Fed. R. Civ. P. 59 and 60 motions, which were subsequently denied, and which opposed the court's original summary judgment decision as well as the award of fees. Mercy next filed a supplemental motion seeking attorney fees for having defended the motions. The court granted the motion and awarded Mercy supplemental fees. TCEMCA filed this timely appeal.

II.

We first address TCEMCA's claim that the district court abused its discretion when it found Mercy to be a prevailing party for purposes of an award of attorney fees under [HN1]the Civil Rights Attorney's Fees Awards Act of 1976. As applied, the statute provided, in relevant part:

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 . . . , [or] title VI of the Civil Rights Act of 1964 . . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b). Before a plaintiff is eligible to recover attorney fees, that plaintiff must have "prevailed" in an action or proceeding brought under the statute. *Texas State Teachers* [*6] *Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789, 103 L. Ed. 2d 866, 109 S. Ct. 1486 (1989). We recently addressed this issue in *Payne v. Board of Education, Cleveland City Schools*, 88 F.3d 392 (6th Cir. 1996). In that decision, we synthesized the relevant Supreme Court decisions that discussed the framework for determining a "prevailing party" in attorney fee award cases:

[HN2]To be considered a "prevailing party," a plaintiff must be able to point to a resolution of [a] dispute which changes the legal relationship between itself and the defendant. A plaintiff therefore must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. In other words, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

This circuit recognizes that it is not necessary that a party actually receive some form of judicially ordered relief to qualify as a "prevailing party." It [*7] is possible that a lawsuit produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment--e.g., a monetary settlement or a change in conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor. However, there must be some actual benefit to the plaintiff either in terms of monetary damages, injunctive relief, or a voluntary change in a defendant's conduct.

Where no direct relief is obtained and a plaintiff is claiming he or she "prevailed" because the defendant made significant changes in its past practices, the plaintiff's lawsuit must have been the "catalyst" that caused the defendant to make the changes. A two-part test is used to determine "prevailing party" status under the "catalyst" test. The first determination is whether, as a matter of fact, the plaintiff's lawsuit was a necessary and important factor in achieving the relief desired. If this first question is answered affirmatively, the second inquiry is whether the relief obtained resulted from a gratuitous act on the defendant's part or whether defendant's [*8] actions were mandated by law.

*Id.* at 397-98 (citations, footnote, and some quotation marks omitted). Further, the Supreme Court has held that an award of fees is proper even where a party prevails only on a non-civil rights claim pendent to a substantial constitutional claim. *Maher v. Gagne*, 448 U.S. 122, 132, 65 L. Ed. 2d 653, 100 S. Ct. 2570 (1980).

In this case, the district court held that Mercy was a prevailing party because the court had previously granted summary judgment in Mercy's favor holding that TCEMCA had no authority to impose mandatory fees. The court found that, prior to the litigation of this case, TCEMCA had imposed mandatory fees upon Mercy. Further, as a result of its decision that the imposition of fees violated the Fourteenth Amendment, the court held that the legal relationship between the parties had altered "to the direct benefit of plaintiffs." Therefore, because Mercy had prevailed on one-third of its claims, the court found the victory to be significant and awarded attorney fees.

[HN3]We review a district court's factual determination of whether a party "prevailed" for clear error, *Heeren v. City of Jamestown*, 39 F.3d 628, 631 (6th Cir. [*9] 1994), and any subsequent decision to award or deny attorney fees for an abuse of discretion, *Payne*, 88 F.3d at 397; *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 308-09 (6th Cir. 1988).

TCEMCA claims, first, that Mercy was not a prevailing party because TCEMCA never disputed that it was unable to impose mandatory fees. Second, TCEMCA claims that the district court never made a factual finding upon which Mercy could prevail. Finally, TCEMCA asserts that the legal relations between it and Mercy never changed because Mercy was not granted

any relief; in other words, TCEMCA argues it did not have to give anything up.

TCEMCA's argument that the fees were voluntary, not mandatory, is a factual question that was resolved by the district court and was not properly raised on appeal. Critically, TCEMCA did not contest the district court's grant of summary judgment on that issue when it filed its Rule 59 and Rule 60 motions. Instead, TCEMCA attacked the grant of attorney fees by claiming Mercy was not a prevailing party. Likewise, the claim that the court never made a factual finding supporting its grant of summary judgment, is disingenuous and not supported by the record. As [*10] we have noted, the court found that TCEMCA had assessed fees against Mercy and other service providers. In footnote 7 of its decision, the court highlighted evidence refuting TCEMCA's claim that the fees were voluntary. Further, the district court determined that its decision went beyond altering the relationship between Mercy and TCEMCA and affected other ambulance services that were similarly situated.

In light of the foregoing, we cannot conclude that the district court clearly erred in finding that TCEMCA had imposed mandatory fees upon Mercy, or abused its discretion in determining that Mercy was a prevailing party. This is particularly so because TCEMCA did not initially contest the court's decision to grant summary judgment in favor of Mercy.

The question, then, is whether prevailing on one issue out of three is enough to be considered a prevailing party under 42 U.S.C. § 1988. The Supreme Court has conclusively spoken to this issue and, as noted above, has held that [HN4]a party may be entitled to attorney fees even where that party has prevailed only on an issue pendent to a substantial constitutional issue. *Maher*, 448 U.S. at 128. Further, where, as here, the litigation [*11] "materially alters the legal relationship between the parties," a fee is proper, and the degree of success goes only to the reasonableness of the amount of the fee. *Farrar v. Hobby*, 506 U.S. 103, 114, 121 L. Ed. 2d 494, 113 S. Ct. 566 (1992).

We affirm the district court's decision holding that Mercy was a prevailing party for purposes of recovering attorney fees under 42 U.S.C. § 1988.

## III.

We next consider whether the district court abused its discretion in determining the amount of attorney fees it ultimately awarded. For the reasons that follow, we conclude there was no abuse of discretion in the fee award.

As an initial matter, Mercy argues that TCEMCA failed to raise this issue before the district court and is,

therefore, barred from arguing it on appeal. "It is a general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976). And normally we do not consider arguments raised for the first time on appeal. *Federal Deposit Ins. Corp. v. Binion*, 953 F.2d 1013, 1018 (6th Cir. 1991). However, in this case the district court *sua sponte* addressed [*12] the amount of the fee award. Moreover, TCEMCA addressed this issue, albeit superficially, in its subsequent Rule 60 motion. Considerations of reasonableness move us to review this issue and, additionally, to hold that the district court did not abuse its discretion.

The Supreme Court has stated that [HN5]a court, when determining the reasonableness of an award of attorney fees, should begin the process by examining the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983). The court should then exclude hours that are excessive, redundant, duplicative, or otherwise unnecessary. However:

> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on [*13] claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Id.* at 434 (footnote omitted). Further,

> If . . . plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the

most critical factor is the degree of success obtained.

. . . That the plaintiff is a "prevailing party" . . . may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. . .

There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited [*14] success. The court necessarily has discretion in making this equitable judgment.

_Id._ at 436-37.

In this case, the district court reviewed the time records of Mercy's attorney in detail. Although the court excluded 32.75 hours as unrelated to the issues presented and relief granted by the court, it specifically held that the unsuccessful claims in the first and second issues were "sufficiently related to the third cause of action to be included in the award of attorney fees." The court also found that the litigation established a change in the parties' relationship unrelated to the fees issue. Specifically, the court held:

As a result of the litigation, plaintiffs obtained a concession from defendants that TCEMCA is a governmental body. Along with the clarification of TCEMCA's legal status came a clarification of the duties and responsibilities of TCEMCA, and of the plaintiffs' rights regarding the establishment of protocols. . . . As a result of this Court's findings, these issues have been clarified with respect to federal law.

The effect of the victory on the third cause of action should also be viewed in light of how it affects others similarly situated to [*15] plaintiffs. This victory affects all other ambulance services against whom mandatory fees were or would have been assessed.

## IV.

We find no abuse of discretion in the court's determination that the attorney fees awarded to Mercy were reasonable.

Accordingly, the judgment below is **AFFIRMED**.

LEXSEE



Cited
As of: Apr 09, 2010

**ADVANCED ACCESSORY SYSTEMS, LLC, Plaintiff-Appellant, Cross-Appellee,
v. ANDY GIBBS; and DOUG GIBBS, Defendants-Appellees, Cross-Appellants.**

**Case Nos. 01-1740; 01-1796; 01-2245**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**71 Fed. Appx. 454; 2003 U.S. App. LEXIS 14465**

**July 16, 2003, Filed**

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. 96-71458, 96-73954. O'Meara. 04-27-01. 08-23-01.

**DISPOSITION:** Case remanded to district court for final determination of damages. Judgment of district court affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After the United States District Court for the Eastern District of Michigan granted summary judgment to defendant employees on a fraud claim and to plaintiff employer on an intentional infliction of emotional distress, abuse of process, and conspiracy claims, the remaining breach of contract claim was tried to a jury, which found for the employees, and awarded $ 1.9 million to each. Both parties appealed.

**OVERVIEW:** The employer contracted to purchase all shares of a company owned by the employees. To retain the employees' knowledge and expertise, the employer

entered into an employment agreement with each of them. Eventually, the employer closed down the division in which the employees worked. Inter alia, the appellate court held that the record showed no factual basis for the jury's award of incentive compensation to the employees. Rather, after the employee's division was closed, the employer realized significant net sales increases. Thus, the record did not support the contention that while the division was in operation, it was helping the bottom line. Since the incentive compensation award was easily separated from the rest of the damages award, the appellate court instructed the district court on remand to reduce the monetary award to each employee by $ 500,000. The district court's judgment was sufficient to trigger the running of postjudgment interest under 28 U.S.C.S. § 1961 because the judgment unconditionally entitled the employees to damages.

**OUTCOME:** The appellate court remanded the case to the district court for a final determination of damages consistent with the instant opinion. On all other issues, the court affirmed the district court's judgment.

**CORE TERMS:** attorneys' fees, employment agreements, rack, prejudgment interest, present value, misrepresentation, final judgment, indemnification, counterclaim, conspiracy, summary judgment, recommendation, jury verdicts, contractual, breach of contract, intentional infliction of emotional distress, net sales, abuse of discretion, abuse of process, new trial, future damages, calculated, carrier, ski, accessories, employment application, fraud claims, damage award, contingency fee, negotiation

71 Fed. Appx. 454, *; 2003 U.S. App. LEXIS 14465, **

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Civil Procedure > Remedies > Judgment Interest > General Overview*
*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN1]In general, a judgment or decision is final for the purpose of appeal only when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined. According to the United States Supreme Court to determine when a district court's judgment is final, primarily, a reviewing court should consider whether the trial judge has or has not clearly declared his intention that his opinion embody a final decision or whether all of the elements necessary for a final decision are present in a given order or opinion. Though a court's primary focus should be on the judge's intention, the Supreme Court has intimated that a proper final judgment should also contain certain elements: a money judgment must, at least, determine, or specify the means for determining, the amount.

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN2]The United States Supreme Court has adopted a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final.

*Civil Procedure > Judgments > Relief From Judgment > General Overview*
[HN3]Fed. R. Civ. P. 60(a) allows a district court to correct clerical mistakes in judgments and orders arising from oversight or omission at any time of its own initiative or on the motion of any party. Fed. R. Civ. P. 60(a).

*Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule*
[HN4]The fact that the district court did not write down all of its holdings in one place for the ease and convenience of the parties does not render the judgment less than final.

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > Remittiturs*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN5]The appellate court reviews for abuse of discretion the district court's decision whether to grant a new trial, and the jury's verdict should be accepted if it is one which could reasonably have been reached.

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > Remittiturs*
[HN6]The standard for obtaining a remittitur is high. A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the conscience of the court. If there is any credible evidence to support a verdict, it should not be set aside. The trial court may not substitute its judgment or credibility determinations for those of the jury.

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > Remittiturs*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN7]The appellate court reviews a district court's denial of a motion for remittitur for an abuse of discretion.

*Civil Procedure > Remedies > Damages > General Overview*
[HN8]A damage award must not be based on mere speculation, guess, or conjecture.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*
[HN9]Michigan law requires that prejudgment interest be calculated on the entire judgment from the date that the complaint was filed, even when certain monetary claims included in the judgment had not accrued at the time of filing.

*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*
[HN10]Strict construction of the Michigan statutes-- Mich. Comp. Laws §§ 600.6013 and 600.6301--require that prejudgment interest be calculated on the award of future damages.

Page 2

*Civil Procedure > Remedies > Judgment Interest > Postjudgment Interest*
*Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest*
[HN11]In diversity cases, questions of prejudgment interest are to be determined under state law, while federal law governs the rate of postjudgment interest.

*Civil Procedure > Remedies > Judgment Interest > General Overview*
[HN12]Fed. R. Civ. P. 54(b) states that a district court may direct the entry of a final judgment as to one or more but fewer than all of the claims upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

*Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN13]Entry of judgment on less than all of the claims in a lawsuit is within the discretion of the district court, and the appellate court reviews its actions for an abuse thereof.

*Civil Procedure > Remedies > Judgment Interest > Postjudgment Interest*
[HN14]Under 28 U.S.C.S. § 1961(a), interest shall be allowed on any money judgment in a civil case recovered in a district court. According to the United States Court of Appeals for the Sixth Circuit, for interest to begin running under § 1961, there must be a judgment that "unconditionally entitles" a party to fees or damages, even if the amount of the damages has not been quantified.

*Civil Procedure > Remedies > Judgment Interest > General Overview*
[HN15]Post-judgment interest runs from the date of any judgment that is not entirely set aside, including an initial, partial judgment even though that judgment was not yet appealable.

*Contracts Law > Remedies > Liquidated Damages*
[HN16]Under Michigan law, parties to a contract may agree that the breaching party must pay the reasonable attorneys' fees of the other side.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN17]The appellate court reviews for abuse of discretion the district court's determination on fees.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN18]The factors a court applying Michigan law should consider when examining the reasonableness of attorneys' fees include: (1) the time and labor required, the novelty and difficulty of the questions involved. and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN19]Though Michigan courts have awarded attorneys' fees based upon the amount of a contingency fee in some circumstances, those courts have nonetheless held that the amount defendant agreed to pay his attorneys' under the contingency fee agreement is not irrebuttable proof that the same amount should be awarded to defendant as a reasonable attorney fee. In other words, whether an attorney is working on a contingency basis should be considered, but only as one factor among several.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
[HN20]The United States Supreme Court has emphasized the merits of using a lodestar calculation as opposed to awarding attorneys' fees based upon the amount of a contingency fee, and the desirability of eschewing the use of a multiplier to ratchet up the lodestar amount based upon the difficulty of the legal issues or the riskiness of assuming a case.

*Civil Procedure > Remedies > Costs & Attorney Fees > General Overview*
*Civil Procedure > Appeals > Costs & Attorney Fees*

*Contracts Law > Contract Conditions & Provisions > General Overview*
[HN21]In Michigan, a contractual provision for reasonable attorneys' fees in enforcing provisions of the contract may validly include allowance for services rendered upon appeal.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Exclusionary Rule*
[HN22]To invoke the exclusionary rule, an actual dispute must exist, preferably some negotiations, and at least an apparent difference of view between the parties as to the validity or amount of the claim.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN23]The appellate court examines the jury instructions to determine whether the district court's charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN24]The district court's refusal to give a specific instruction requested by a party is reviewed for an abuse of discretion.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN25]A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are confusing, misleading, and prejudicial.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
*Contracts Law > Breach > Material Breach*
*Contracts Law > Remedies > Compensatory Damages > General Overview*
[HN26]In the commercial contract situation, unlike the tort actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estima-

tion. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith.

*Contracts Law > Breach > General Overview*
*Contracts Law > Remedies > Compensatory Damages > General Overview*
*Contracts Law > Remedies > Foreseeable Damages > Benefit of the Bargain*
[HN27]In Michigan, if there was a breach of contract, then the jury must determine the amount of damages caused by the breach. The purpose of damages for breach of contract is to provide the innocent party with the benefit of his bargain and place him in a position equivalent to that which he would have attained had the contract been performed. Damages recoverable for breach of contract are those that may fairly and reasonably be considered as arising naturally from the breach itself or which may reasonably be supposed to have been in the contemplation of both parties when the contract was formed as a probable result of the breach. It must be shown that the damages are the natural and proximate consequence of the breach complained of. A party must prove the amount of damages that it suffered as a result of breach with a reasonable degree of certainty as opposed to being based upon mere conjecture or speculation. However, the fact that the precise amount of damage may be difficult to ascertain does not require a party to prove the amount of its damages with mathematical precision.

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN28]The appellate court reviews de novo the district court's grant of summary judgment.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN29]In Michigan, the general rule is that to constitute actionable fraud it must appear: (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

71 Fed. Appx. 454, *; 2003 U.S. App. LEXIS 14465, **

*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*
[HN30]In Michigan, an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud. When there exists privity of contract between the alleged misrepresenter and the allegedly duped party, the "innocent misrepresentation rule" abolishes the requirements that the alleged misrepresenter know that his misrepresentation is false, and that the opposing party prove reliance. Finally, when a party makes representations upon which the other party, with the first party's knowledge, relies, and the truthfulness of those representations changes, the first party has a duty to disclose the change in circumstances to the latter party so as to avoid being guilty of fraudulent concealment.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
*Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion*
[HN31]Simply put, misrepresentations of existing facts of a business constitute fraud, but opinions or statements about the future prospects of a business (such as those a salesman might make) are not actionable. So, a statement about the prospects of a business that turns out to be false is not actionable in and of itself, although such a statement might be actionable if combined with a misrepresentation of existing fact or past performance upon which the rosy prediction is based.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN32]Fraud is not perpetrated upon one who has full knowledge to the contrary of a representation.

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN33]There is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN34]In Michigan, the tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Intentional Torts > Prima Facie Tort > General Overview*
[HN35]To plead a tort claim based on a breach of contract, a plaintiff must allege violations of an independent legal duty distinct from the duties arising out of the contractual relationship.

*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN36]Civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means. The agreement, or preconceived plan, to do the unlawful act is the thing which must be proved. Direct proof of agreement is not required, however, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN37]A conspiracy requires more than one conspirator, and a corporation cannot conspire with itself.

*Criminal Law & Procedure > Criminal Offenses > Property Crimes > Larceny & Theft > General Overview*
[HN38]See Mich. Comp. Laws § 408.485.

*Torts > Intentional Torts > Abuse of Process > Elements*
*Torts > Intentional Torts > Malicious Prosecution > General Overview*
[HN39]In Michigan, the elements of an abuse of process claim are (1) an ulterior motive, and (2) an act by the defendant which is improper in the regular prosecution of the proceeding.

**COUNSEL:** For ADVANCED ACCESSORY SYSTEMS, LLC, Plaintiff - Appellant, Cross-Appellee (01-

1740, 01-1796, 01-2245): Stephen F. Wasinger, Wasinger, Kickham & Hanley, Royal Oak, MI.

For ADVANCED ACCESSORY SYSTEMS, LLC, Plaintiff - Appellant, Cross-Appellee (01-1740, 01-1796): Gregory D. Hanley, Wasinger, Kickham & Hanley, Royal Oak, MI.

For ADVANCED ACCESSORY SYSTEMS, LLC, Plaintiff - Appellant, Cross-Appellee (01-2245): Norman C. Ankers, Honigman, Miller, Schwartz & Cohn, Bingham Farms, MI.

For ANDY GIBBS, DOUG GIBBS, Defendants - Appellees, Cross-Appellants (01-1740, 01-1796, 01-2245): [**2] Christopher P. Legghio, Duane F. Ice, Martens, Ice, Geary, Klass, Legghio, Israel & Gorchow, Southfield, MI.

For ANDY GIBBS, DOUG GIBBS, Defendants - Appellees, Cross-Appellants (01-1740, 01-1796, 01-2245): Michael J. Bommarito, Foster, Swift, Collins & Smith, Lansing, MI.

**JUDGES:** BEFORE: BATCHELDER and ROGERS Circuit Judges; BARZILAY, * Judge.

> \*    The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

**OPINION BY:** ALICE M. BATCHELDER

**OPINION**

[*456]    **ALICE M. BATCHELDER, Circuit Judge.** This case in diversity arises from a soured business relationship between Advanced Accessory Systems, LLC ("Advanced") and brothers and business partners Andy Gibbs and Doug Gibbs ("the Gibbses"), after Advanced purchased the Gibbses' company, entered into employment agreements with the Gibbses and then became dissatisfied with the deal. Advanced sued the Gibbses for fraud and breach of contract, and the Gibbses counterclaimed against Advanced, its parent company MascoTech and the latter's corporate affiliates, and three corporate officers of the named companies (collectively "Advanced") for breach of contract, violations of California labor laws, [**3] conspiracy to violate labor laws, intentional infliction of emotional distress, and abuse of process, and demanded an accounting and indemnification. After many of the Gibbses' claims were dismissed by agreement of the parties, the district court granted summary judgment to the Gibbses on Advanced's fraud claims and to Advanced on the Gibbses' claims of intentional infliction of emotional distress,

abuse of process and conspiracy. The breach of contract claims were tried to a jury, which found in favor of the Gibbses, and awarded $ 1.9 million to each brother. The Gibbses and Advanced both appeal.

Because the record does not contain sufficient credible evidence to support the incentive compensation component of the jury verdicts, we remand to the district court with instructions to make a final determination of damages consistent with this opinion. On the other issues before us, we affirm the judgment of the district court.

**I**

In the early 1990s, Andy and Doug Gibbs founded a company called Sport [*457] Rack Systems ("SRS") in Yuba City, California, to develop and produce automobile racks to hold bikes, skis, snowboards, and the like. In 1992, Advanced [1] was interested in entering [**4] the rack and rack accessories business, and decided to purchase the needed technology and expertise from an existing enterprise rather than attempt to develop such technology itself.

> 1    Advanced was called by several different names between 1992 and 1995. At the time it became involved with the Gibbses, it was known as "Huron/St. Clair, Inc.", which was an operating unit of MascoTech, Inc., a $ 1.5 billion company that engaged in numerous mergers and acquisitions. Huron/St. Clair later became MascoTech Accessories, which was sold in 1995 and then renamed Advanced Accessory Systems. We will refer to the company as "Advanced."

After conducting due diligence on SRS for approximately six months, Advanced contracted with the Gibbses to purchase all of SRS's stock. In order to retain the knowledge and expertise of the Gibbs brothers, Advanced entered into an Employment Agreement with each of them. Each Employment Agreement stipulated a base salary of $ 110,000, an annual bonus based upon a percentage of Advanced's [**5] net sales, [2] a one-time "incentive compensation" payment of $ 500,000 if Advanced's aggregate net sales of specified products between 1993 and 1998 reached $ 400,000,000. and severance pay of $ 55,000. Each Agreement provided that if the respective Gibbs brother were terminated for cause, all of his employment benefits would cease; however, if Advanced terminated him without cause, Advanced was obligated to pay him for the duration of the contract.

> 2    The total amount of these annual bonuses, over time, was capped at $ 1.4 million for each Gibbs brother.

After Advanced purchased SRS, it allowed the Gibbses and a small team of their employees to remain in

California [3], where their division was renamed the Pacific Design Group ("PDG"), and was responsible for the design, marketing, and sales of racks and rack accessories. When PDG did not produce the profits that the Gibbses had predicted, the Gibbses attributed PDG's difficulties to making the transition into Advanced and quarrels with Advanced's management, [**6] as well as the alteration of PDG designs by Advanced without notice to the Gibbses. In the summer of 1994, less than two years after the Purchase Agreement was signed, Advanced closed PDG Engineering in California and moved all of PDG's equipment to Advanced's headquarters in Michigan, save a few items that would allow the Gibbses to maintain an office in California.

> 3   Under the terms of their Employment Agreements, the Gibbses were entitled to remain in California.

In August 1994, Doug Gibbs was given a list of projects over which he maintained some responsibility, but the Gibbses were given no substantive assignments after January 1995. In autumn 1995, MascoTech sold Advanced to an investment group that included Advanced executive Marshall Gladchun. In preparing the financial statements attendant to this transaction, Advanced booked its employment contracts with the Gibbses as an estimated $ 2.1 million liability in order to reflect the money owed to the Gibbses under their Employment Agreements over the next [**7] few years. This amount was raised to approximately $ 2.7 million paid out over time, or about $ 2.2 million present value, in later MascoTech estimates.

In January 1996, Advanced stopped paying the Gibbses their salaries and bonuses, although it did not terminate their employment contracts. Because they remained [*458] employees of Advanced, the Gibbses were required under their Employment Agreements to "work from home" during normal business hours and to refrain from engaging in other employment in the car rack industry.

Shortly thereafter, Advanced sued the Gibbses, alleging fraud, on the grounds that the Gibbses had misrepresented themselves in the initial sale of SRS to Advanced, and breach of the Purchase Agreement and Employment Agreements; and demanding indemnification for all losses, attorneys' fees, and court costs pursuant to the Purchase Agreement. The Gibbses filed a counterclaim against Advanced, MascoTech and its corporate affiliates, and three individual corporate executives, claiming breach of contract for failure to pay under the Employment Agreements; two violations of the California labor code; conspiracy to deny the Gibbses their salaries and bonuses in violation of [**8] California law; intentional infliction of emotional distress; indemnifica-

tion; and abuse of process; and demanding an accounting.

After both sides filed for summary judgment, the Gibbses stipulated to the dismissal of all claims against Masco Industries, Masco Corp., MascoTech, and the individual executives, except the California labor law claims, which the district court dismissed, granting the Gibbses leave to amend their counterclaim to bring those claims under Michigan law. The court then granted the Gibbses' summary judgment motion with respect to the fraud claims brought against them, holding that Advanced had provided no evidence showing the falsity of certain representations made by the Gibbses in connection with the sale and operation of SRS. Lastly, the court granted summary judgment to Advanced on the Gibbses' claims of intentional infliction of emotional distress, abuse of process, and conspiracy.

The breach of contract claims of each party were tried to a jury, which returned a verdict in favor of the Gibbses for $ 3.8 million. Over the Gibbses' objections, the court entered judgment on the jury verdict on August 6, 1999, so as to end the running of prejudgment interest [**9] at 12%. The court held that it would hear arguments pertaining to indemnification and amend the judgment if necessary at a later time. The court also denied Advanced's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial.

The parties tried to appeal at this point, but we dismissed their appeal for lack of jurisdiction because the Gibbses' claim for attorneys' fees as an element of their counterclaim for indemnification was still outstanding. This claim was referred to a magistrate, who issued a Report and Recommendation (the February 4, 2000, Report and Recommendation), recommending, among other things, that notwithstanding the fact that the judgment included damages for claims that did not accrue until after the counterclaim was filed, prejudgment interest should accrue on the entire judgment from the date that Gibbses filed the counterclaim. The February 4, 2000, Report and Recommendation was adopted without any alteration by the district court. The magistrate issued a second report (the March 1, 2001, Report and Recommendation), which was adopted in its entirety by the district court on April 25, 2001, determining in part the amount of attorneys' [**10] fees to be awarded the Gibbses and determining the method by which the remaining award of attorneys' fees would be calculated. On May 9, 2001, the Gibbses moved for an entry of final judgment, or, in the alternative, an entry of an amended judgment. The district court denied this motion on [*459] August 22, 2001, holding that its judgment of April 25, 2001, adopting the March 1, 2001, Report and Recommendation, constituted a final judgment. Timely notices of appeal and cross-appeal followed.

71 Fed. Appx. 454, *; 2003 U.S. App. LEXIS 14465, **

## II

### A. Jurisdiction

We note preliminarily that the orders appealed from are final for purposes of appeal despite the lack of specific dollar figures for the attorneys' fees owed for Graham's and Miller's [4] time or for the prejudgment interest. [HN1]"In general, a 'judgment' or 'decision' is final for the purpose of appeal only 'when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined.'" _Parr v. United States, 351 U.S. 513, 518, 100 L. Ed. 1377, 76 S. Ct. 912 (1956)_ (quoting _St. Louis, I.M. & S. Ry. Co. v. S. Express Co., 108 U.S. 24, 28, 27 L. Ed. 638, 2 S. Ct. 6 (1883)_). In _United States v. F. & M. Schaefer Brewing Co., 356 U.S. 227, 2 L. Ed. 2d 721, 78 S. Ct. 674 (1958),_ [**11] the Court examined several factors to determine when a district court's judgment is final. Primarily, a reviewing court should consider "whether the [trial] judge has or has not clearly declared his intention" that his opinion "embody a final decision." _id._ at 232 (emphasis removed), or whether all of the elements necessary for a final decision are present in a given order or opinion. _Id._ at 232-33. Though a court's primary focus should be on the judge's intention, the Supreme Court intimated that a proper final judgment should also contain certain elements: a money judgment "must, at least, determine, or specify the means for determining, the amount." _Id._ at 233-35; _see also McDermitt v. United States,_ 954 F.2d 1245, 1248-50 (6th Cir. 1992) (examining the sufficiency of a money judgment the district court clearly intended to be a final judgment).

> 4   When the Gibbses were sued, they initially retained the California law firm of Graham & James, who in turn retained the Michigan firm of Miller Canfield as local counsel, to defend the suit and prosecute the counterclaims. The Gibbses incurred almost $ 200,000 in legal fees from these two firms, and ran out of funds to continue to retain their services. They were able to persuade their current attorneys from the firm of Martens Ice to take their case on a contingency fee basis.

[**12]  Here, the _Schaefer Brewing_ requirements have been satisfied. The district court expressly stated "that its April 25, 2001, order and judgment constitutes a final judgment because it disposes of all of the claims of all of the parties .... No other ruling is needed by this court to specify damages." Moreover, although the attorneys' fees have not yet been calculated, and hence, because those fees are an element of the Gibbses' indemnification claim, the total award of damages upon which the prejudgment interest may be calculated has not been

set, "the means for determining" the amount of the final judgment are available to the parties, and neither party's appeal touches upon issues that are unresolved as a result of the district court's failure to place a dollar value in its final judgment. "Furthermore, [HN2]the Supreme Court has adopted 'a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final.'" _Tahfs v. Proctor,_ 316 F.3d 584, 590 (6th Cir. 2003) (quoting _Budinich v. Becton Dickinson and Co.,_ 486 U.S. 196, 202, 100 L. Ed. 2d 178, 108 S. Ct. 1717 (1988)).

### [*460]  [**13]  B. Entry of final judgment

In a related matter, the Gibbses charge that the district court erred by failing to enter a final or amended judgment pursuant to [HN3]Rule 60(a), which allows a district court to correct "clerical mistakes in judgments [and] orders ... arising from oversight or omission ... at any time of its own initiative or on the motion of any party." Fed. R. Civ. P. 60(a). As we have already explained, the district court did enter a final judgment. [HN4]The fact that the district court did not write down all of its holdings in one place for the ease and convenience of the parties does not render the judgment less than final, and the court's denial of the Rule 60(a) motion was not an abuse of discretion. See _Scarfo v. Cabletron Sys., Inc.,_ 54 F.3d 931, 936 (1st Cir. 1995) (considering an appeal in which the "final judgment" was composed of a number of different district court rulings, and noting that "were we to remand for entry of a 'final judgment' that is formally in full compliance with Rule 58, before deciding the appeal that has now been briefed and argued, the case would in due course be back before us again with precisely the same issues to be [**14] decided as those we perceive from the record now before us.").

### C. Jury award of incentive compensation

Advanced requests a new trial or, in the alternative, a remittitur decreasing the total amount of the jury award by $ 1 million based upon its contention that the jury was not presented with evidence upon which it could award $ 500,000 of incentive compensation to each of the Gibbs brothers. [HN5]We review for abuse of discretion the district court's decision whether to grant a new trial, _Conte v. General Housewares Corp.,_ 215 F.3d 628, 637 (6th Cir. 2000), and "the jury's verdict should be accepted if it is one which could reasonably have been reached." _Id._ (citations and internal quotations omitted). [HN6]The standard for obtaining a remittitur is high:

> A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most fa-

vorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the conscience of the court. If there is any credible evidence to support a verdict, it should not be set aside. The [**15] trial court may not substitute its judgment or credibility determinations for those of the jury.

_Farber v. Massillon Bd. of Educ., 917 F.2d 1391, 1395 (6th Cir. 1990)_ (internal quotations and citations omitted). [HN7]We review a district court's denial of a motion for remittitur for an abuse of discretion. _Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433, 149 L. Ed. 2d 674, 121 S. Ct. 1678 (2001)._

Advanced argues that the jury was presented with no credible evidence to uphold the award of $ 500.000 incentive compensation to each Gibbs brother. The Gibbses Employment Agreements each provide that "if aggregate Net Sales of Products for the five year period beginning January 1. 1993 and ending December 31, 1997 is at least $ 400,000,000, the Executive shall receive" incentive compensation of $ 500,000. The "products" to which the agreements refer are "roof racks, integrated electronics in roof rack systems, other roof rack accessories and related rack products sold within the transportation industry." The parties stipulated to sales figures showing that the Net Sales of Products from 1993 through the end of 1997 was only $ 323 [**16] million, approximately $ 77 million short of the $ 400 million necessary to trigger the award of incentive compensation to the Gibbses. The Gibbses argue that each of [*461] them is entitled to that compensation because the $ 400 million mark would have been met had Advanced not impeded the Gibbses' efforts and eventually breached their employment agreements.

[HN8]"A damage award must not be based on 'mere speculation, guess, or conjecture.'" _John E. Green Plumbing & Heating Co. v. Turner Constr. Co., 742 F.2d 965, 968 (6th Cir. 1984)._ We find in this record no factual basis for the jury's award of incentive compensation to the Gibbses. Rather, the record shows that in the years after the PDG operations were closed (1996 and 1997), Advanced realized significant increases in Net Sales. The record does not support the contention that while PDG was in operation, it was helping the bottom line with regard to Net Sales such that Advanced would have realized far more in sales had it not shut down PDG and stopped using the Gibbses talents, even if we account for the possibility that the efforts put forth at PDG from 1993 through 1995 directly contributed to the increased

sales in 1996 [**17] and 1997. In any event, both Advanced and the Gibbses had strong economic incentives to maximize the Net Sales figure, and there is no evidence that Advanced sabotaged its own prospects of success in the rack market (to the tune of $ 77 million) in order to deprive the Gibbses of $ 1 million in incentive bonuses.

Since the award of incentive compensation is easily separated out from the rest of the damages award in this case, [5] we instruct the district court on remand to reduce the monetary award to each Gibbs brother by $ 500,000.

[5]  The jury could not have reached $ 3.8 million in contractual damages if it had not included $ 1 million of incentive compensation in that amount. Because, under the terms of the Employment Agreements, incentive compensation was either due the Gibbses in full or not due them at all, we can easily determine what the jury's verdict would have been had it not included the award of incentive compensation.

**D.    Reducing    damages    to    present value/Calculating prejudgment interest**

[**18] Advanced contends that the damages award, which included payments to which the Gibbses were entitled under the Employment Agreements but which had not yet come due at the time their counterclaim was filed, should have been reduced to present value because prejudgment interest began to run on the award from the date of the Gibbses' filing. In its Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial, Advanced complained that "the Gibbs' [sic] claimed damages included amounts not yet due when the Complaint was filed; but the Gibbs did not provide any evidence reducing their damage claims to present value; and, as a result, any damages were excessive as a matter of law." The district court denied this motion, and Advanced renewed its objection regarding the calculation of damages before the magistrate judge. The magistrate judge recommended that prejudgment interest be calculated on the entire award, and by order dated March 15, 2000, the district court adopted that recommendation without alteration. In its notice of appeal, Advanced noted that it was appealing the district court's denial of its Motion for a JNOV, or in the Alternative, for a New Trial, [**19] and "any other prior adverse order[]" that was entered by the district court. The Gibbses now argue that because the notice of appeal did not specify that it was appealing the district court's March 15, 2000, order. Advanced is procedurally barred from raising the present value issue.

We conclude that the issue is properly before us. By specifying both the district [*462] court's order denying

its Motion for JNOV, and "any other prior adverse orders" in its Notice of Appeal. Advanced complied sufficiently with Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure. Advanced briefed the present value issue in its initial brief before this court; Advanced's Motion for JNOV mentioned the present value issue; and the district court's March 15, 2000, order adopting the magistrate's February 4, 2000, Report and Recommendation was certainly an "adverse order."

Advanced argues that the damages award is excessive because it includes prejudgment interest both on the damages that had accrued by the time the counterclaim was filed and on future damages--payments to which the Gibbses would have been entitled under the Employment Contract, but which were not yet due when the counterclaim was filed--not [**20] reduced to present value. The Gibbses urge us to review this claim for plain error, since Advanced neither asked for the jury to be instructed on present value nor objected to the lack of such an instruction. We need not determine whether or not Advanced was required to raise this issue in the context of jury instructions in order to preserve its full rights on appeal, since, even if we review the issue de novo, we conclude--albeit somewhat reluctantly--that the district court did not err in calculating prejudgment interest on the future damages without reducing them to present value.

Citing H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co., 234 Mich. App. 550, 595 N.W.2d 176 (Mich. Ct. App. 1999), this circuit recently held that "we are convinced [HN9]Michigan law requires that prejudgment interest be calculated ... on the entire judgment from the date that the complaint was filed," even when certain monetary claims included in the judgment had not accrued at the time of filing. Perceptron, Inc. v. Sensor Adaptive Machs., Inc., 221 F.3d 913, 923 (6th Cir. 2000). Tucker relied upon Paulitch v. Detroit Edison Co., 208 Mich. App. 656, 528 N.W.2d 200 (Mich. Ct. App. 1995). [**21] which, it is important to note, was a case in which the jury did not receive an instruction regarding the present value of future damages, and the judgment was not reduced to present value by the court. Noting that the Michigan courts were split on the issue, and that awarding prejudgment interest on future damages not reduced to present value resulted in a double benefit to the plaintiff, the Paulitch court nonetheless held that [HN10]strict construction of the Michigan statutes--Mich. Comp. L. §§ 600.6013 and 600.6301--required that prejudgment interest be calculated on the award of future damages. Paulitch, 528 N.W.2d at 204. Like the Chief Justice of the Michigan Supreme Court, who found this interpretation of Michigan's statutory scheme both sound as a matter of statutory construction and "troubling" as a matter of public

policy, Buzzitta v. Larizza Indus., Inc. 465 Mich. 972, 641 N.W.2d 593, 593-94 (Mich. 2002) (Corrigan, C.J., concurring), we are troubled by the awarding of prejudgment interest on future damages, but we think that Michigan law requires this result. We instruct the district court, on remand, to calculate the prejudgment interest in accordance [**22] with the latest version of Mich. Comp. L. § 600.6013, effective March 22, 2002, which alters the rate of prejudgment interest for actions filed at the time the Gibbses brought their counterclaim.

E. Timing of the entry of judgment

The Gibbses argue that the district court erred when it entered judgment on the jury verdict before the court determined indemnification damages, thereby causing the judgment to accrue interest at [*463] the (then much lower) federal postjudgment rate instead of the (then much higher) prejudgment rate, which is set by Michigan law. See Diggs v. Pepsi-Cola Metro. Bottling Co., 861 F.2d 914, 924 (6th Cir. 1988) (explaining that, [HN11]in diversity cases, "questions of prejudgment interest ... are to be determined under state law," while "federal law governs the rate of postjudgment interest"). The court noted that it would amend the judgment, if appropriate, after holding a hearing on the indemnification claims. Advanced defends the district court's action, noting that equitable considerations support the entry of judgment on the jury verdict insofar as the Gibbses had a strong incentive to drag out the indemnification hearings as long as possible, [**23] given that interest was accruing at 12%.

[HN12]Fed. R. Civ. P. 54(b) states that a district "court may direct the entry of a final judgment as to one or more but fewer than all of the claims ... upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." [HN13]Entry of judgment on less than all of the claims in a lawsuit is within the discretion of the district court, and we review its actions in this instance for an abuse thereof. Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436, 100 L. Ed. 1297, 76 S. Ct. 895 (1956).

[HN14]Under 28 U.S.C. § 1961(a), "interest shall be allowed on any money judgment in a civil case recovered in a district court." We have held that for interest to begin running under § 1961, there must be a judgment that "unconditionally entitles" a party to fees or damages, even if the amount of the damages has not been quantified. Associated General Contractors of Ohio, Inc. v. Drabik, 250 F.3d 482, 491-92 (6th Cir. 2001). [HN15]"Post-judgment interest runs from the date of any judgment that is not entirely set aside," including an "initial, partial judgment . [**24] .. even though that judgment was not yet appealable." Skalka v. Fernald Envtl.

*Restoration Mgmt. Corp.*, 178 F.3d 414, 429 (6th Cir. 1999).

The Gibbses assert that "the District Court's Judgment on the Jury Verdict was *not* a final. appealable judgment and did *not* meaningfully ascertain all of [their] damages." Even so. our precedents indicate that the judgment rendered by the district court was sufficient to trigger the running of postjudgment interest under § 1961 because the judgment entered unconditionally entitled the Gibbses to damages. The district court did not, therefore, abuse its discretion in entering its Judgment on the Jury Verdict prior to addressing the Gibbses' indemnification claims.

**F. Award of attorneys' fees**

In his February 4, 2000, Report and Recommendation. the magistrate judge concluded that the "reasonable attorney fees" owed to the Gibbses under the indemnification provision of the Purchase Agreement were not to be measured by the amount of the contingency fee award garnered by Martens Ice for its successful defense of Advanced's claims and prosecution of the Gibbses' counterclaims, but instead by a reasonable rate measuring [**25] the value of its services. In his March 1, 2001, Report and Recommendation, the magistrate determined a "lodestar" amount of attorneys' fees owed to the Gibbses by multiplying by $ 200 the number of hours expended by Martens Ice, then reducing that total amount 5% for prosecution of frivolous, unsuccessful claims. The Gibbses argue that they should have been awarded their actual attorneys' fees and costs, measured by the amount of the contingency fee; in the alternative, they claim that the lodestar amount should have been multiplied by 2 in order to reflect the fact that Martens [*464] Ice took their "undesirable" and risky case on a contingency basis [6] They also claim that they should be awarded their attorneys' fees, costs, and expenses on appeal.

> [6] The Gibbses assert a difference of over $ 1.2 million between the indemnification awarded them by the district court and the actual amount of their attorneys' fees, costs, and expenses.

[HN16]Under Michigan law, parties to a contract may agree that the breaching party must [**26] pay the reasonable attorneys' fees of the other side. *Zeeland Farm Servs., Inc. v. JBL Enters., Inc.,* 219 Mich. App. 190, 555 N.W.2d 733, 736 (Mich. Ct. App. 1996). [HN17]We review for abuse of discretion the district court's determination on fees. *See Big Yank Corp. v. Liberty Mut. Fire Ins. Co.,* 125 F.3d 308, 312 (6th Cir. 1997). [HN18]The factors a court applying Michigan law should consider when examining the reasonableness of attorneys' fees include

(1) the time and labor required, the novelty and difficulty of the questions involved. and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent. [**27]

*Zeeland,* 555 N.W.2d at 737 n.3.

[HN19]Though Michigan courts have awarded attorneys' fees based upon the amount of a contingency fee in some circumstances, *see City of Detroit v. J. Cusmano & Son, Inc.,* 184 Mich. App. 507, 459 N.W.2d 3, 5-6 (Mich. Ct. App. 1989) (affirming a trial court's award of attorneys' fees based upon the amount a 33% contingency fee arrangement after examining many of the factors set forth in *Zeeland*), those courts have nonetheless held that "the amount defendant agreed to pay his attorneys' under the contingency fee agreement is not irrebuttable proof that the same amount should be awarded to defendant as a reasonable attorney fee." *City of Flint v. Patel,* 198 Mich. App. 153, 497 N.W.2d 542, 545 (Mich. Ct. App. 1993). In other words, whether an attorney is working on a contingency basis should be considered, but only as one factor among several.

In *City of Burlington v. Dague,* 505 U.S. 557, 120 L. Ed. 2d 449, 112 S. Ct. 2638 (1992), [HN20]the Supreme Court emphasized the merits of using a lodestar calculation as opposed to awarding attorneys' fees based upon the amount of a continency fee, [**28] and the desirability of eschewing the use of a multiplier to rachet up

the lodestar amount based upon the difficulty of the legal issues or the riskiness of assuming a case. *Id.* at 562-67. Though that decision dealt with the award of attorneys' fees specified in certain federal statutes. and is therefore not binding on the district court in this instance, it does offer strong persuasive authority for the reasonableness of the district court's calculation.

In this case, after rejecting the Gibbses' contention that a reasonable fee is per se the amount of the contingency fee in this case, the magistrate determined a reasonable rate--$ 200 per hour--by examining some of the factors set out under Michigan law. We think that the approach taken by [*465] the magistrate, which was subsequently adopted by the district court, accords with the dictates of Michigan law, and therefore hold that the district court did not abuse its discretion in this matter.

The Gibbses also claim that the award of attorneys' fees should have included a provision for appellate fees, costs, and expenses. In *Schellenberg v. Rochester Elks, 228 Mich. App. 20, 577 N.W.2d 163, 179 (Mich. Ct. App. 1998),* [**29] the "plaintiff [sought] to recover attorney fees incurred in defending this appeal and prosecuting its cross appeal. Such an award is proper under the act" which provides for attorneys' fees (although not appellate fees specifically). Similarly, in *Central Transport, Inc. v. Fruehauf Corp., 139 Mich. App. 536, 362 N.W.2d 823 (Mich. Ct. App. 1984),* the court found that "attorney fees awarded under the lease agreements are an item of damages arising from breach of those agreements. [HN21]A contractual provision for reasonable attorneys' fees in enforcing provisions of the contract may validly include allowance for services rendered upon appeal." *362 N.W.2d at 829.* In the latter case, the court remanded the issue to the trial court to make a determination of whether the contractual provision encompassed attorneys' fees on appeal; if it did, the appeals court instructed the trial court to include appellate costs and fees in the damages award. *Id.*

As did the court in *Central Transport,* we instruct the district court on remand to consider whether, pursuant to the contract between the Gibbses and Advanced, the Gibbses are entitled to their appellate attorneys' [**30] fees and costs, and, if so, to include such fees and costs in its final damages calculation.

## G. Evidence of pre-trial negotiations

Advanced argues that the district court erred in admitting--over Advanced's objections--evidence regarding (1) discussions, which were held in 1995 among Advanced executives as they contemplated the sale of Advanced to a group of investors, about how to book the Gibbses' Employment Agreements and the possibility of buying out those contracts, and (2) a letter sent by Andy

Gibbs to Advanced in August of 1995, to which he never received a response, proposing that Advanced buy out the Gibbses' contracts. Advanced claims that these communications should be considered settlement negotiations whose content is inadmissible under *Fed. R. Evid. 408,* despite the fact that the communications in question all took place prior to the filing of any legal claim by Advanced or the Gibbses. It argues, in the alternative, that the prejudicial impact of the communications outweighs their probative value, and that the communications should have been excluded under *Rule 403.*

These contentions are meritless. In 1995 when these discussions were held and the letter [**31] was sent, there was no clearly-defined disputed claim between the parties that they could have settled. [7] In fact, the letter from Andy Gibbs and the internal communications at Advanced, when viewed together, indicate that the parties held a similar understanding regarding Advanced's obligation to pay the Gibbses under the Employment Agreements. Moreover, we think that these communications are probative of the true nature of the contractual relations between the parties, and their probative value well outweighs any prejudicial impact they might have had. The district court therefore did not [*466] abuse its discretion in admitting that evidence. Finally, even if the district court should have excluded evidence of the so-called "settlement discussions," it minimized any improper influence that such evidence might have had on the jury by instructing the jury that evidence of an attempted settlement between the parties may not be considered as evidence of liability.

> 7 McCormick states: [HN22]"To invoke the exclusionary rule, an actual dispute must exist, preferably some negotiations, and at least an apparent difference of view between the parties as to the validity or amount of the claim." MCCORMICK ON EVIDENCE § 266, at 184 (5th ed. 1999).

## [**32] H. Jury instructions

Advanced claims that the district court should have given three particular jury instructions, which we will consider in turn. [HN23]We examine the jury instructions to determine "whether the [district court's] charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Fisher v. Ford Motor Co., 224 F.3d 570, 575-76 (6th Cir. 2000)* (internal quotations and citations omitted). However, [HN24]the district court's refusal to give a specific instruction requested by a party is reviewed for an abuse of discretion. *Id.* at 576. [HN25]A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are "confusing,

71 Fed. Appx. 454, *; 2003 U.S. App. LEXIS 14465, **

misleading, and prejudicial." *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 787 & n.3 (6th Cir. 2003).

First, Advanced alleges that the district court should have instructed the jury that "the state of mind or motives of a party are not material in determining whether there has been a breach of contract or the amount of damages." In support of this proposition, Advanced cites *Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. 401, 295 N.W.2d 50 (Mich. 1980). [**33] which held that [HN26]"in the commercial contract situation, unlike the tort ... actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith." 295 N.W.2d at 55. The district court instructed the jury as follows:

> [HN27]If you determine that there was a breach of contract, then you must determine the amount of damages caused by the breach. The purpose of damages for breach of contract is to provide the innocent party with the benefit of his bargain and place him in a position equivalent to that which he would have attained had the contract been performed.

> Damages recoverable for breach of contract are those that may fairly and reasonably be considered as arising naturally from the breach itself or which may reasonably be supposed to have been in the contemplation of both parties when the contract was formed as a probable result of the breach.

> It must be shown that the damages are the natural and proximate consequence of the breach complained of. A party must prove the amount of damages [**34] that it suffered as a result of breach with a reasonable degree of certainty as opposed to being based upon mere conjecture or speculation. However, the fact that the precise amount of damage may be difficult to ascertain does not require a party to prove the amount of its damages with mathematical precision.

We think that the charge as a whole fairly and accurately presents the applicable law to the jury. Even if the district court could have included the point of law emphasized by Advanced, namely, that bad faith does not impact damages for a contractual breach, the court was not obligated to do so as long as it presented the applicable law fairly. In fact, the court's instruction that damages must be those "fairly and reasonably be considered as [*467] arising naturally from the breach itself" implicitly excludes from consideration any damages based purely upon bad faith.

Second, Advanced argues that the district court should have instructed the jury that "accounting entries in general business documents listing internal obligations are not evidence of liability." Neither party cites any law that is binding on this circuit, the Eastern District of Michigan, or the Michigan state courts, [**35] to support its respective position that accounting entries either can or cannot be used as evidence of liability. We find no abuse of discretion here.

Third, Advanced focuses on the fact that Doug Gibbs lied about his qualifications on his employment application and his resume; this fact was elicited on cross-examination and thereby made known to the jury during the course of the trial. Because of Gibbs's misrepresentations, Advanced urged the district court to instruct the jury that "evidence of employee misconduct, including false statements on an employment application or resume, are relevant to the issue of damages," even if Advanced did not discover the fraud until after the lawsuit. The district court instead gave the following instructions: "Every contract includes an implied promise of good faith and fair dealing requiring that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract."

Advanced relies upon two Michigan cases--*Smith v. Union Charter Twp.*, 227 Mich. App. 358, 575 N.W.2d 290 (Mich. Ct. App. 1997), and *Wright v. Restaurant Concept*, 210 Mich. App. 105, 532 N.W.2d 889 (Mich. Ct. App. 1995) [**36] --which hold that, in the context of employees suing a company for damages based upon racial discrimination, the damages paid to the employees can be limited if the employees had lied on their employment applications, even if the employer does not discover that fact until the discovery phase of the discrimination lawsuit. In those cases, making false statements on an employment application was grounds for immediate termination.

In the case before us, even though false statements made on an employment application are relevant to damages, it is not apparent that the cited cases are applicable in this context. As an initial matter, Doug Gibbs's submission of a resume containing false information during the due diligence process is not grounds for termination under his Employment Agreement, and even if it were. Advanced does not make such an argument. The employment relationship between Advanced and Doug

Gibbs was governed by an Employment Agreement that allowed Advanced to terminate him at any time for cause, with cause being defined as "conviction ... of a crime involving moral turpitude or a crime providing for a term of imprisonment ... or [Gibbs's] willful misconduct (defined for [**37] purposes hereof as an intentional act or omission which a reasonable person would deem to be detrimental to the best interests of the Company ...)." We think that the existence of a carefully defined contract governing the relationship between Doug Gibbs and Advanced that does not provide for his termination due to misrepresentation about his resume and the fact that his cause of action at trial was based entirely upon that contract distinguish this case from the racial discrimination cases cited by Advanced.

Moreover, the jury was not barred from considering the fraud as evidence in this case; it was not incumbent upon the district court to remind the jurors of what they could and could not consider so long as the court's instructions accurately described the applicable law. We do not think that the district court abused its [*468] discretion by failing to remind the jurors that Gibbs's misrepresentations could have a bearing on the damages he could recover.

## I. Advanced's fraud claims

In its complaint, Advanced alleges fraud based upon the Gibbses' material misrepresentation about "their own knowledge and experience, [as well as] the business and assets of Sport Rack." Specifically, [**38] Advanced claims that the Gibbses' descriptions of their own skills and the assets of Sport Rack were false, and that the documents furnished Advanced in the pre-sale negotiations contained "omissions of material information." The district court granted the Gibbses' motion for summary judgment on the fraud claim, holding that some alleged misrepresentations were merely conjecture as to future events, and noting that while

> Advanced lists a number of misrepresentations, it does not discuss why the representations are fraudulent, nor does it supply evidence that the representations are false, other than the testimony of Advanced CEO Marshall Gladchun, who merely identifies the representations that he *believes* must be false because the Gibbses apparently failed to live up to his expectations.

[HN28]We review de novo the district court's grant of summary judgment. *Ullmo v. Gilmour Acad.,* 273 F.3d 671, 676 (6th Cir. 2001). The parties agree that the ele-

ments of fraud are set forth in *Hi-Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813 (Mich. 1976).

> [HN29]The general rule is that to constitute actionable fraud it must [**39] appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*Id.* at 816 (citations and internal quotations omitted). Moreover, [HN30]"an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Id.* at 816. When there exists privity of contract between the alleged misrepresenter and the allegedly duped party, the "innocent misrepresentation rule" abolishes the requirements that the alleged misrepresenter know that his misrepresentation is false, and that the opposing party prove reliance. *United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77, 85 (Mich. 1981). [**40] Finally, when a party makes representations upon which the other party, with the first party's knowledge, relies, and the truthfulness of those representations changes, the first party has a duty to disclose the change in circumstances to the latter party so as to avoid being guilty of fraudulent concealment. *Id.* at 88-89.

Given that many of the allegations of falsehood regarding the Gibbses' statements to Advanced prior to the sale of SRS concern material from SRS's business plans and projections, it is important to understand the role that such projections play in the legal context of establishing fraud. [HN31]Simply put, misrepresentations of *existing* facts of a business constitute fraud, *Paquin v. Van Houtum,* 343 Mich. 111, 72 N.W.2d 169, 176 (Mich. 1955), but opinions or statements about the future prospects [*469] of a business (such as those a salesman might make) are not actionable. *Van Tassel v. McDonald Corp.,* 159 Mich. App. 745, 407 N.W.2d 6, 8 (Mich. Ct. App. 1987). So, a statement about the prospects of a business that turns out to be false is not actionable in and of itself, although such a statement might be actionable if

71 Fed. Appx. 454, *; 2003 U.S. App. LEXIS 14465, **

combined with a [**41] misrepresentation of existing fact or past performance upon which the rosy prediction is based. *See Mesh v. Citrin,* 299 Mich. 527, 300 N.W. 870, 873 (Mich. 1941); *Martin v. Veana Food Co.,* 153 Mich. 282, 116 N.W. 978 (Mich. 1908).

In its briefs, Advanced points primarily to the testimony of Marshall Gladchun to "establish[] that Gibbs' description of their own skills and of Sport Rack's business and assets were false." First, Gladchun complains that Doug Gibbs told him that a certain SRS product--the top-wing ski carrier--was OEM quality, and it was not. The problems with the ski carrier were, in fact, a subject of negotiation and incorporated into the Purchase Agreement via an amendment to the Agreement which apportioned any liability "arising from the defective top wing ski carriers." From Gladchun's testimony, [8] there is no indication that Gibbs knew, when making the representation as to the ski carrier's OEM quality, that it was false. Moreover, any representation as to quality is clearly superseded by the knowledge possessed by both parties regarding the ski carrier at the time the Purchase Agreement was executed and amended. [HN32]"Fraud is [**42] not perpetrated upon one who has full knowledge to the contrary of a representation." *Montgomery Ward & Co. v. Williams,* 330 Mich. 275, 47 N.W.2d 607, 611 (Mich. 1951).

> 8  Q: You now take the position that when [Gibbs] made the representation that [the ski carrier] was OEM quality, that was a misrepresentation?
>
> A: Yes.
>
> Q: And the only way you conclude that he intentionally misrepresented is by the events that occurred later?
>
> A: Yes.
>
> Q: Nothing else?
>
> A: The events that occurred later, yes.
>
> Q: Later?
>
> A: Yes.

Second, Gladchun got the "impression" that he was misled by Andy Gibbs regarding Gibbs's relationships with customers, particularly those developed through two manufacturer's representatives. However, Gibbs had expressly told Gladchun that one of the two representatives was planning to join SRS *after* the company acquired enough funding. Moreover, given that Advanced required SRS to terminate its relationships with any manufacturer's reps once Advanced took over, Gladchun cannot [**43] now complain that he was misled because the second manufacturer's rep never joined SRS. Gladchun

admits that SRS's lack of a relationship with the two manufacturer's reps "did not dissuade [him] from engaging or acquiring Sport Rack Systems."

Third, Gladchun "got the impression" from Andy Gibbs that the latter "had spent a significant amount of time with customers and had established relationships to provide him the information to build his business plan; and as it turned out, I found that not to be the case." In his deposition, Gladchun also parses through a report or prospectus of SRS and lists without corroborating detail, what he believes to be misrepresentations in that document. Neither Advanced nor Gladchun have offered any further evidence on these claims such that they could survive summary judgment.

Fourth, Gladchun asserts that Andy Gibbs fraudulently misrepresented his [*470] management skills because he was unable to manage the sales force to reach PDG's goals. This complaint is based upon PDG's failure to meet projections, and is not actionable.

The Gibbses point out that [HN33]"there is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization [**44] is circumscribed in no respect by defendant." *Schuler v. American Motors Sales Corp.,* 39 Mich. App. 276, 197 N.W.2d 493, 495 (Mich. Ct. App. 1972); *see also Nieves v. Bell Indus.,* 204 Mich. App. 459, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994); *Webb v. First of Michigan Corp.,* 195 Mich. App. 470, 491 N.W.2d 851, 853 (Mich. Ct. App. 1992) (citing *Schuler*). While not dispositive in this case, we note that Advanced conducted due diligence on SRS for approximately six months before purchasing that company, a fact that further weakens Advanced's attempt to prove that it was misled in entering into the Purchase and Employment Agreements with the Gibbses. We therefore affirm the grant of summary judgment in favor of the Gibbses on Advanced's fraud claims.

## J. The Gibbses' tort claims

The Gibbses argue that the district court erred in dismissing on summary judgment their claims of intentional infliction of emotional distress, conspiracy, and abuse of process. We will address the three claims in turn.

First, the Gibbses claim that Advanced attempted to "cripple them financially, threaten them with permanent financial ruin, and [**45] force them to surrender their company, patents, products and compensation" by terminating their pay but retaining them as employees--thereby keeping in place contractual restrictions on their employment options--and then suing them even after Advanced's officers had discussed buying out their "firm" contracts. These actions, allege the Gibbses, con-

stitute the intentional infliction of emotional distress, and warrant a trial on the issue.

[HN34]The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

_Haverbush v. Powelson_, 217 Mich. App. 228, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996) (internal citations omitted). The district court found that Advanced's behavior did "not rise to the level of 'extreme and outrageous conduct' that is 'atrocious and utterly intolerable [**46] in a civilized community,'" and we agree. Advanced's conduct in this instance was not tortious, it was simply in breach of the contract. [HN35]To plead a tort claim, the Gibbses must "allege violations of an independent legal duty distinct from the duties arising out of the contractual relationship." _Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.,_ 454 Mich. 65, 559 N.W.2d 647, 658 (Mich. 1997). The district court correctly concluded that the Gibbses failed to do so.

Second, the Gibbses claim that Advanced officers Gladchun and Borghi, and Hoffman, an agent of the venture capital group that eventually purchased Advanced from Masco Tech, conspired to deprive the Gibbses of compensation in violation of Michigan's Wage and Fringe Benefits Act, Mich. Comp. Laws §§ 408.471 _et seq._ Instead of buying out the Gibbses' contracts, as Hoffman had suggested, Gladchun said that he would "deal" with the Gibbses after the sale of Advanced.

[HN36] [*471]   Civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means. The agreement, or preconceived plan, to [**47] do the unlawful act is the thing which must be proved. Direct proof of agreement is not required, however, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact.

_Temborius v. Slatkin,_ 157 Mich. App. 587, 403 N.W.2d 821, 827-28 (Mich. Ct. App. 1986).

Noting that [HN37]a conspiracy requires more than one conspirator, and that a corporation cannot conspire with itself, the district court found that the Gibbses neither mentioned the venture capital group or Hoffman in their complaint, nor presented any evidence that Hoffman was involved in the conspiracy. Therefore, the only remaining conspirators for the court to consider were Gladchun and Borghi, who, as agents of Advanced, comprised a single corporate entity, which, as the district court correctly concluded, could not conspire with itself.

The Gibbses, however, argue that "a joint action may be maintained against the conspirators for the damages caused by their wrongful acts, but all the conspirators need not be joined; an action may be maintained against but one." _Brown v. Brown,_ 338 Mich. 492, 61 N.W.2d 656, 662 (Mich. 1953) [**48]  (internal quotations and citations omitted). Regardless of whether the failure to mention Hoffman and the venture capital group in the complaint (even if those parties are not joined as defendants) is fatal to the Gibbses' claim, the district court can be upheld on another grounds. Mich. Comp. Laws § 408.485, upon which the Gibbses predicate their conspiracy claim, provides as follows: [HN38]"An employer who, with intent to defraud, fails to make payment of the wages and fringe benefits due an employee as provided in this act, is guilty of a misdemeanor." There is no evidence that Advanced stopped paying wages to the Gibbses _with any intent to defraud;_ the relations between the two parties had certainly soured, but a breach of an employment contract is not a criminal act. No predicate offense exists upon which a charge of conspiracy could be based.

Third, the Gibbses claim that Advanced abused legal process by threatening to send a copy of its legal complaint against the Gibbses to the mortgage companies which had mailed employment verification inquiries regarding the Gibbses to Advanced. Ultimately, Advanced did not respond to the banks' requests for employment verification. [HN39]The elements [**49]  of an abuse of process claim are (1) an ulterior motive, and (2) an act by the defendant which is improper in the regular prosecution of the proceeding. _Meehan v. Michigan Bell Tel. Co.,_ 174 Mich. App. 538, 436 N.W.2d 711, 727 (Mich. Ct. App. 1989). The district court correctly found that "the Gibbses have not alleged facts that suggest that Advanced improperly affected or abused process after it had been issued."

**III**

For the foregoing reasons, we REMAND this case to the district court for a final determination of damages consistent with the instructions herein. On all other issues, we AFFIRM the judgment of the district court.

LEXSEE


Caution
As of: Apr 09, 2010

**KAREN MILLER, Plaintiff-Appellee, v. ALLDATA CORP., and ROBERT WEIFFENBACH, Defendants-Appellants.**

No. 99-2035

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

14 Fed. Appx. 457; 2001 U.S. App. LEXIS 15684

**July 6, 2001, Filed**

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Certiorari Denied February 19, 2002, Reported at: 2002 U.S. LEXIS 660.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. 98-10138. Roberts. 08-25-99.

**DISPOSITION:** Court AFFIRMED the district court's denials of Alldata's motions for judgment as a matter of law, new trial, and remittitur, and court AFFIRMED the district court's award of $ 177,628.29 in attorney's fees, costs, and interest to Miller.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, employer and supervisor, appealed from an order of the United States District Court for the Eastern District of Michigan which denied their motions seeking: (1) judgment (notwithstanding the verdict) as a matter of law; (2) new trial; and/or (3) remittitur following a jury verdict on a former employee's employment discrimination claim.

**OVERVIEW:** Plaintiff sued defendants, her ex-employer and her former supervisor, for gender discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2501-2507. A jury found in her favor and awarded her $ 16,000 in economic damages and $ 300,000 for emotional distress damages. The district court denied defendants' motions for judgment as a matter of law, new trial, and/or remittitur, and defendants appealed. They argued that they were entitled to judgment as a matter of law on plaintiff's gender discrimination claim because she failed to demonstrate that the business reasons offered for firing her were pretextual. The court of appeals noted, inter alia, that plaintiff was almost universally perceived as occupying the same hierarchical level as her two male counterparts (a perception confirmed by the company's organizational chart), yet she was paid $ 25,000 less per year than her male colleagues. The court added that the jury's emotional distress damage award was comparable to cases upheld by the Michigan appellate courts and thus, the district court did not abuse its discretion in awarding attorney's fees, costs, and interest to plaintiff.

**OUTCOME:** The district court's denials of defendant's motions for judgment as a matter of law, new trial, and remittitur were affirmed as was the district court's award of attorney's fees, costs, and interest to plaintiff.

**CORE TERMS:** attorney's fees, matter of law, male, new trial, touching, documentation, termination, remittitur, gender discrimination, jury instructions, jury's verdict, emotional distress, terminated, proffered, gender, sexual, fired, salary, hired, prima facie case, leave to

Page 1

14 Fed. Appx. 457, *; 2001 U.S. App. LEXIS 15684, **

amend, emotional, subjected, diversity, pretext, conversation, training, annual, e-mail, damage award

**LexisNexis(R) Headnotes**

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Appeals > Standards of Review > General Overview*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Employment Practices > Discharges*
[HN1]In diversity cases, the U.S. Court of Appeals for the Sixth Circuit applies a state-law standard of review to a Fed. R. Civ. P. 50(b) motion for judgment as a matter of law based on a challenge to the sufficiency of the evidence.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts*
*Civil Procedure > Trials > Jury Trials > Jurors > General Overview*
[HN2]Under law of the U.S. Court of Appeals for the Sixth Circuit (Sixth Circuit), in reviewing a trial court's failure to grant a defendant's motion for a directed verdict or judgment notwithstanding the verdict, Sixth Circuit must examine the testimony and all legitimate inferences that may be drawn in the light most favorable to the plaintiff. If reasonable jurors could honestly have reached different conclusions, the motion should have been denied. If reasonable jurors could disagree, neither the trial court nor the Sixth Circuit has the authority to substitute its judgment for that of the jury.

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
[HN3]Under Michigan law, a directed verdict is appropriate only when a case presents no factual dispute on which reasonable minds could differ.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN4]A federal court applies state substantive law to the state law claims in a diversity action.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Employment Practices > Employment Tests*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Burden Shifting*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens*
[HN5]In testing the sufficiency of evidence in an employment discrimination case, initially, the plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. To establish a prima facie case of gender discrimination under the McDonnell-Douglas framework, a plaintiff must show that she: (1) is a member of a protected class; (2) was subjected to an adverse employment action; (3) was qualified for her position; and (4) was replaced by a person outside of the protected class.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*
[HN6]Once the plaintiff has made out a prima facie case of employment discrimination, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This is merely a burden of production; the ultimate burden of persuasion remains with the plaintiff.

*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*
[HN7]In the final step of the McDonnell Douglas analysis, the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination against the plaintiff. The plaintiff may prevail if she can adduce evidence showing that: (1) the proffered reason had no basis in fact, or (2) the proffered reason did not actually motivate the employer's action, or (3) the proffered reason was insufficient to motivate discharge.

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
*Criminal Law & Procedure > Postconviction Proceedings > Motions for New Trial*

*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*
[HN8]The denial of a motion for a new trial is reviewed under an abuse of discretion standard: a definite and firm conviction on the part of the reviewing court that the court below committed a clear error of judgment.

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
*Evidence > Procedural Considerations > Weight & Sufficiency*
[HN9]In diversity cases where a party moves for a new trial, the district court applies federal law to determine whether the verdict was against the great weight of the evidence. While this standard is lower than when evaluating the sufficiency of the evidence for judgment as a matter of law, the standard is still rigorous, because in finding that a jury's verdict was against the weight of the evidence, the judge must, to some extent at least, substitute his judgment of the facts and the credibility of the witnesses for that of the jury.

*Evidence > Testimony > Lay Witnesses > Opinion Testimony > Personal Perceptions*
*Evidence > Testimony > Lay Witnesses > Opinion Testimony > Rational Basis*
*Evidence > Testimony > Lay Witnesses > Ultimate Issue*
[HN10]Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704(a). Furthermore, Fed. R. Evid. 701 states that a lay witness may offer opinion testimony if those opinions are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue. Both the U.S. Court of Appeals for the Sixth Circuit and Michigan courts have held it is not error to allow a lay witness to express an opinion regarding discrimination in an employment setting as long as the opinion complies with the requirements of Fed. R. Evid. 701.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Civil Procedure > Trials > Jury Trials > Jury Instructions > Requests for Instructions*
[HN11]Although trial courts have broad discretion in framing jury instructions, state law determines the substance of jury instructions in a diversity action, while federal procedural law governs questions regarding the propriety of the instructions.

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > Remittiturs*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN12]The U.S. Court of Appeals for the Sixth Circuit reviews the denial of remittitur for an abuse of discretion.

*Civil Procedure > Judgments > Relief From Judgment > Additurs & Remittiturs > General Overview*
[HN13]A district court should reduce a jury's award of damages only when the judgment "clearly exceeds" the maximum damages a reasonable jury could find to compensate the plaintiff's loss. Thus, federal appeals courts may reduce a jury award only if it is: (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake. Moreover, the excessiveness of a verdict is primarily a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Remedies > General Overview*
[HN14]Under Michigan law, victims of discrimination may recover for the humiliation, embarrassment, disappointment, and other forms of mental anguish which flow from the discrimination.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Remedies > General Overview*
[HN15]Under Michigan law, in a gender discrimination claim, any competent evidence of emotional damages is enough to sustain a jury verdict.

*Civil Procedure > Appeals > Costs & Attorney Fees*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN16]The U.S. Court of Appeals for the Sixth Circuit reviews a district court's award of attorney's fees and costs for an abuse of discretion.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*
*Civil Procedure > Appeals > Costs & Attorney Fees*

[HN17]As a general rule, a federal court may not award attorney's fees to the prevailing party unless a statute or binding contract authorizes such a recovery.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Civil Procedure > Appeals > Costs & Attorney Fees*
[HN18]Under Michigan law, the "lodestar" figure of hours spent multiplied by the hourly rate is presumed to be the reasonable attorney's fee. Further, the district court considers the following factors when calculating the reasonableness of attorney's fees: (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client.

**COUNSEL:** For KAREN REED MILLER, Plaintiff - Appellee: E. Michael Morris, Daniel G. LeVan, Morris & Doherty, Birmingham, MI.

For ALLDATA CORPORATION, ROBERT WEIFFENBACH, Defendants - Appellants: Robert L. Rediger, Rediger McHugh, Sacramento, CA.

**JUDGES:** Before: MARTIN, Chief Judge; MOORE, Circuit Judge; and O'MALLEY, District Judge. *

> * The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

**OPINION BY:** Kathleen O'Malley

**OPINION**

[*458] **O'MALLEY,** [**2] **District Judge.** Plaintiff Karen Miller sued her ex-employer, defendant Alldata Corporation, and her former supervisor, defendant Robert Weiffenbach, jointly and severally, for gender discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2501-2507. A jury found in Miller's favor and awarded her $ 16,000 in economic damages and $ 300,000 for emotional distress damages.

The defendants responded to the jury's verdict with motions seeking: (1) judgment (notwithstanding the verdict) as a matter of law; (2) new trial; and/or (3) remittitur. The district court denied all of these motions, and also awarded Miller $ 177,628 in attorney's fees.

The defendants appeal each of these decisions. Finding no error, we AFFIRM.

I.

This gender discrimination case presents the relatively unusual situation where the plaintiff admits her employer may have had a valid reason for terminating her, but asserts her employer's action was, instead, actually motivated by illegal discrimination. The jury found the plaintiff's assertion well-taken.

The following evidence was adduced at trial. Harry Evangelist, Ted Mannheimer, and plaintiff Karen Miller all worked [**3] similar jobs within the National Accounts Group at the Mitchell Corporation. In 1996, all three left Mitchell to work for defendant Alldata Corporation, a competitor to Mitchell Corporation and a subsidiary of AutoZone. Specifically, Robert Weiffenbach, Alldata's Vice President of Sales, hired Mannheimer away from Mitchell Corporation in May of 1996, to become Alldata's Director of Government and Fleet Sales, at an annual salary of $ 87,500. In June of 1996, Weiffenbach hired Evangelist away from Mitchell Corporation to become Alldata's Director of National Accounts, also at an annual salary of $ 87,500.

In July of 1996, Alldata's president, Rod Georgiou, suggested to Weiffenbach that he should also hire Miller, whom Georgiou knew from trade shows. In September of 1996, Weiffenbach hired Miller to manage Alldata's Value Added Reseller Accounts; she was given the title of Manager of Special Accounts and an annual salary of $ 62,500. While she worked at Alldata, Miller [*459] was the only female in the company's sales force. Evangelist, Mannheimer, and Miller all reported directly to Weiffenbach, and Alldata's Field Sales Organizational Chart showed the three as being at the same hierarchical [**4] level within the company.

Shortly after Alldata hired her, Miller attended an Alldata sales conference in Atlanta. Terry Buschbach, a sales representative who reported to Mannheimer, testified that, during this conference, Miller gave him a back-rub on a walk back to the hotel from dinner. Buschbach felt the touching was "not appropriate" and told Miller so. At trial, Miller acknowledged touching Buschbach, but testified she "kind of ran up to him and put [her] arm either around his shoulders or on his shoulder to say something," and that it was not sexual in any way. Weiffenbach verbally reprimanded Miller for this episode while they were still in Atlanta.

A month later, in early October, Miller attended another Alldata sales conference in Sacramento, California. The night before the meeting was to begin, Miller met several other Alldata employees at a hotel lounge to have a drink. Sales representative Kerry Keller testified he was seated in the bar when Miller "came up and sat down beside the chair, threw her arm around me, had her leg draped across the top of mine and just started talking

to the rest of the guys like nothing [was] going on." Keller stated he was "shocked" by [**5] Miller's conduct and felt it had sexual overtones. The next day, Keller observed Miller rubbing the shoulders of several male Alldata employees. Weiffenbach again spoke to Miller about inappropriate touching while in Sacramento.

Keller claims he decided to document his concerns about Miller's behavior shortly after this Sacramento meeting. Keller testified that he sent Weiffenbach an e-mail describing Miller's conduct and stating he believed Miller could become a liability to Alldata. Weiffenbach testified he did not receive this e-mail until mid-November. Neither Alldata nor Weiffenbach was able to produce Keller's original e-mail. The evidence was clear, however, that Weiffenbach asked Keller to send a re-creation of the message several months later, on March 14, 1997, the day after Miller's termination.

In November of 1996, Weiffenbach contacted Karlyn Oberg, Alldata's human resources director, for advice regarding Miller's conduct. Oberg concluded that Weiffenbach should "have a more emphatic conversation [with Miller] . . . , document the conversation, and send her that documentation in writing so that it would be as formal as possible." Weiffenbach sent Miller a memorandum [**6] on November 19, 1996, directing her to "refrain[] from any physical contact other than a business acceptable handshake or similar activity." The memorandum further warned Miller that, in the event of similar complaints about her behavior, "further disciplinary actions will result, up to and including termination of employment from Alldata." Miller responded that she would follow Weiffenbach's directive.

Alldata held another sales conference in Sacramento in December of 1996. Despite having received Weiffenbach's warning, Miller hugged and rubbed the shoulders of other Alldata staff during training classes. In trial testimony, she conceded she might also have slapped an employee on the butt. One evening, after training classes, she put her hand on the leg of fellow salesperson Rene Young. Midway through the conference, several employees told Alldata national training manager Mark Gunnerson they felt "uncomfortable with regard to [Miller] touching them." Gunnerson relayed these comments to Weiffenbach, who told Gunnerson to take control of his class [*460] and tell Miller to stop touching other staff inappropriately. Gunnerson believed that one employee in particular, Mike Smith, was especially [**7] unhappy with Miller's behavior. At trial, however, Smith denied being "truly upset" by Miller's having touched Young at the December meeting, and said Miller never touched him personally. Smith also testified he did not complain to anyone at Alldata about Miller's conduct, and that no one in his class believed Miller had sexually harassed anyone. Young testified he was "startled" when

Miller touched his leg, but he did not consider it to be a sexual advance.

In a conversation with Weiffenbach roughly three weeks later, Weiffenbach claimed Gunnerson again expressed concern about Miller's conduct at the December training class. Weiffenbach said he explained that, if Gunnerson wanted him to address the complaints about Miller, Gunnerson would have to document them in writing. Gunnerson did not e-mail documentation of the December complaints until March 12, 1997, however, the day before Miller's termination. At trial, Weiffenbach could not explain why it took Gunnerson so long to send the documentation. Weiffenbach explained he had concluded the matter was inconsequential and "figured if it was serious the people would give [him] this thing in writing."

The sum of this evidence suggests [**8] Miller was excessively "touchy-feely," to the point that she made some of her colleagues uncomfortable, but that most of her colleagues did not actually believe she was sexually harassing them. As for Weiffenbach, the evidence suggests he knew of his staff's discomfort with Miller, but he believed the issue was not especially serious and that his senior managers could and would deal with it appropriately. The evidence also suggests Weiffenbach solicited documentation of complaints about Miller just before she was terminated.

In addition to the evidence showing Miller's co-employees were unhappy with her level of physical familiarity, evidence was also adduced showing Miller had reason to be unhappy with Weiffenbach's behavior. Miller testified that, almost immediately after her hire, Weiffenbach began criticizing and degrading her in front of Alldata customers. This included rolling his eyes and explaining to customers that Miller did not know what she was talking about. Weiffenbach answered phone calls from Miller rudely, while he was more pleasant to male employees; he subjected Miller's travel expense reports to criticism and scrutiny that he spared male sales representatives; [**9] and he demanded Miller submit her travel plans one month in advance, while not requiring the same from Evangelist and Mannheimer. More than once, Weiffenbach called Miller at home at 5:00 in the morning to discuss non-emergency business issues, although he did not bother his male employees at such odd hours. He once told Miller, "you're the reason I never re-married." Evangelist and Mannheimer confirmed that Weiffenbach frequently berated and reprimanded Miller for business conduct that they regularly followed themselves without repercussion, and that Weiffenbach required her to follow rules that he did not enforce against any one else. Evangelist also testified that Weiffenbach referred to women in lewd and derogatory terms "almost every time [they] were together." The

evidence was undisputed, moreover, that Miller, though working in the same capacity as Weiffenbach and Mannheimer, was paid substantially less.

After the December, 1996 sales meeting in Sacramento, no Alldata employee complained again about Miller's behavior. In early March of 1997, however, Weiffenbach informed Oberg he had received additional complaints about Miller's conduct. Oberg told him to investigate further [**10] and report [*461] back. Weiffenbach then requested written statements from personnel who had previously indicated they had concerns about Miller. For example, in response to a request from Kerry Keller, Mike Smith e-mailed a memo regarding Miller on March 1, 1997. In this e-mail, Smith described Miller's conduct as "very unprofessional," and said that if other members in the December sales training class had acted that way, their jobs would be "toast." Smith testified he had not planned on writing this memo until Keller asked him to do so.

Shortly after Weiffenbach's discussion with Oberg, he reported to her that the information he had originally gathered had been supported by conversations with Keller and Gunnerson. After reviewing the "whole process," Oberg and Weiffenbach agreed they had "no choice but to terminate [Miller]." In a three-way telephone conversation on March 13, 1996, Oberg and Weiffenbach told Miller she was being fired for repeatedly and inappropriately touching other employees. Miller asked for a lesser punishment and promised to "sew [her] hands in [her] pockets," but Alldata did not relent.

After Miller left, Weiffenbach hired Ed Maron to fill a position similar [**11] to Miller's. Weiffenbach contends he called Maron only after Miller had been fired. But Maron testified he initiated a call to Weiffenbach in mid- to late-March about possible employment at Alldata, and Weiffenbach had responded, "we're working on something and I'll get back to you shortly." Maron started work at an annual salary of $ 65,000, which was raised to $ 75,000 three months later.

After Alldata terminated her, Miller began working for her husband's company. Three months later, Miller obtained a national sales position with Anderson Corporation, at an annual salary of $ 62,500.

At the close of Miller's evidence, Alldata made a motion pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law, which the district court denied. On June 16, 1999, the jury returned a verdict awarding Miller $ 316,000. Alldata renewed its motion for judgment as a matter of law and moved for a new trial and/or remittitur. The district court denied these motions and also awarded Miller $ 177,628.29 in attorney's fees, costs, and interest.

I. Alldata's Renewed Motion for Judgment as a Matter of Law. [2]

2   Unless otherwise noted, "Alldata" refers hereinafter to both defendants.

[**12] Alldata contends it is entitled to judgment as a matter of law on Miller's gender discrimination claim because she failed to demonstrate that the business reasons offered by Alldata for firing her were a mere pretext for gender discrimination. This renewed motion for judgment as a matter of law challenges the sufficiency of the evidence supporting the jury's verdict. [HN1]In diversity cases, this Court applies a state-law standard of review to a Rule 50(b) motion for judgment as a matter of law based on a challenge to the sufficiency of the evidence. *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 506 (6th Cir. 1998) (citing *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996)).

In *Matras v. Amoco Oil Co.*, 424 Mich. 675, 385 N.W.2d 586 (1986), the Michigan Supreme Court explained the applicable standard as follows:

[HN2]In reviewing a trial court's failure to grant a defendant's motion for a directed verdict or judgment notwithstanding the verdict, we examine the testimony and all legitimate inferences that may be [*462] drawn in the light most favorable to the plaintiff. If reasonable jurors could honestly have [**13] reached different conclusions, the motion should have been denied. If reasonable jurors could disagree, neither the trial court nor this Court has the authority to substitute its judgment for that of the jury.

*Id.* at 681-82, 385 N.W.2d at 588. [HN3]A directed verdict is appropriate only when a case presents no factual dispute on which reasonable minds could differ. *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 708, 565 N.W.2d 401, 409 (1997), *appeal denied*, 457 Mich. 874, 586 N.W.2d 919 (1998). [3]

3   Michigan courts use the terms "directed verdict" and "judgment notwithstanding the verdict" rather than "judgment as a matter of law," the term used by Fed. R. Civ. P. 50.

[HN4]This Court applies state substantive law to the state law claims in a diversity action. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817

(1938). Because Miller brings her gender discrimination claim under Michigan's Elliott-Larsen Civil Rights Act, Michigan [**14] substantive law governs this action. Michigan courts, in turn, look to federal law when reviewing claims of employment discrimination filed under the Elliott-Larsen Act. *Lytle v. Malady*, 456 Mich. 1, 27, 566 N.W.2d 582, 595 (1997). Michigan has adopted the United States Supreme Court's burden-shifting analysis for employment discrimination claims. *Id.; Featherly v. Teledyne Industries, Inc.*, 194 Mich. App. 352, 362, 486 N.W.2d 361, 364 (1992).

A. The Prima Facie Case

The Supreme Court first laid out its process for [HN5]testing the sufficiency of an employment discrimination case in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and refined this process in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). Initially, the plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. To establish a prima facie case of gender discrimination under the *McDonnell-Douglas* framework, a plaintiff must show that she: (1) is a member of a protected class; (2) was subjected to an adverse [**15] employment action; (3) was qualified for her position; and (4) was replaced by a person outside of the protected class. *Matras*, 424 Mich. at 683, 385 N.W.2d at 589.

As a woman, Miller is a member of a protected class. She was subjected to an adverse employment action when Alldata fired her on March 13, 1997. Evidence of her employment history with Mitchell Corporation suggests, and Alldata does not dispute, that she was qualified for her Alldata sales management position. And, Alldata replaced Miller with a man named Ed Maron shortly after her termination. It is clear, accordingly, that Miller did establish a prima facie case of gender discrimination.

B. Defendant's Legitimate Reason for Plaintiff's Termination.

[HN6]Once the plaintiff has made out a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *Burdine*, 450 U.S. at 254. This is merely a burden of production; the ultimate burden of persuasion remains with the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). [**16]

In this case, Alldata introduced evidence that Miller subjected male employees to unwanted touchings, and thus subjected Alldata to possible liability for tolerating sexual harassment at the company. Miller does not dispute that she engaged in unwelcome [*463] physical contact with her male co-employees, nor that Alldata reprimanded her for doing so. Although Miller testified she did not "feel there [was] anything wrong with [her behavior]," she essentially concedes Alldata had a non-discriminatory reason for firing her. Alldata's gender-neutral explanation for its action "destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence." *Burdine*, 450 U.S. at 255 n.10.

C. Plaintiff's Rebuttal

[HN7]In the final step of the analysis, the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination against the plaintiff. *Meagher*, 222 Mich. App. at 711, 565 N.W.2d at 410. The plaintiff may prevail if she can adduce evidence showing that: (1) the proffered reason had no basis in fact, or (2) the proffered reason did not actually motivate the employer's [**17] action, or (3) the proffered reason was insufficient to motivate discharge. *Id.* at 711-12, 565 N.W.2d at 411; *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Miller relied at trial, and in her appellate briefs, primarily on the second prong. We conclude there was sufficient evidence from which a jury could reasonably conclude that, in fact, Alldata's stated reason for terminating Miller was not its actual reason, and that, instead, Alldata terminated Miller based on gender discrimination.

Under the second prong, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* have motivated dismissal. *Manzer*, 29 F.3d at 1084. The plaintiff then makes an indirect attack on the credibility of the employer's proffered explanation by showing circumstances which tend to prove that an illegal motivation was more likely. *Id.* That is, the plaintiff argues that the sheer weight of circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext. *Id.*

Miller presented at trial substantial [**18] circumstantial evidence that Alldata (and, particularly, Weiffenbach) was more likely motivated to terminate her by a discriminatory intent than by a desire to promote a harassment-free workplace. As noted, Miller, Evangelist, and Mannheim all testified consistently that, from the beginning of Miller's tenure with Alldata, Weiffenbach treated her differently than male employees. This different treatment included reprimands they did not receive for similar behavior, enforcement of rules against her and not them, and a heightened degree of scrutiny, criticism,

and unsupportive attention applied to her but spared the male sales representatives. Further, although virtually every Alldata employee perceived Evangelist, Mannheimer, and Miller as occupying the same hierarchical level within the company (confirmed by Alldata's Field Sales Organizational Chart), Miller was paid $ 25,000 less per year than her two male colleagues. After Alldata hired Maron to fill a position similar to Miller's in March 1997, it quickly gave him a raise to pay him $ 12,500 more than she had been making. Put simply, there was a large body of evidence from which a jury could reasonably reach the conclusion that [**19] Weiffenbach singled out Miller for adverse treatment because of her gender.

In addition to this evidence of discrimination, Miller presented evidence that Weiffenbach misled human resources director Oberg as to the timing and validity of the complaints against Miller. [4] In early [*464] March of 1997, Weiffenbach informed Oberg he had received additional complaints about Miller since he had spoken to Oberg about Miller in November of 1996. However, the events Weiffenbach used to corroborate the existence of these "new" complaints had all taken place several months earlier. Further, Weiffenbach solicited documentation of these earlier events from Alldata personnel who had theretofore decided not to complain in writing, and Weiffenbach then pointed to these documents as new evidence of Miller's inappropriate behavior -- all at about the same time he learned that Maron, a male, was interested in working for Alldata and could replace Miller.

> 4   There was no evidence that Oberg intentionally discriminated against Miller based on her gender.

[**20]   Alldata argues persuasively that it had a reason to terminate Miller. But Alldata does not persuade us that no reasonable jury could have found it more likely that Alldata's *actual* reason was gender discrimination. "If reasonable jurors could disagree, neither the trial court nor this Court has the authority to substitute its judgment for that of the jury." *Matras*, 424 Mich. at 682, 385 N.W.2d at 588. Examining all testimony and drawing all inferences in the light most favorable to Miller, a reasonable juror could have concluded that: (1) Miller's unwelcome touching of other employees *may* have given Alldata reason to terminate her; (2) despite this, Alldata did not do so; and (3) Alldata's motivation when it ultimately terminated Miller was not because she acted inappropriately but, instead, was a gender-discriminatory animus. Accordingly, the district court did not err when it denied Alldata's motion for judgment as a matter of law.

II. Alldata's Motion for a New Trial.

In the alternative, Alldata argues it is entitled to a new trial, for a number of reasons. [HN8]The denial of a motion for a new trial is reviewed under an abuse of discretion standard: [**21] "a definite and firm conviction [on the part of the reviewing court] that the court below committed a clear error of judgment." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996). We find that none of the recited bases for new trial leaves us with such a conviction.

Alldata first contends that the clear weight of the evidence necessarily leads to the conclusion that the jury made a mistake in rendering a verdict for Miller. [HN9]In diversity cases, the district court applies federal law to determine whether the verdict was against the great weight of the evidence. *Morales*, 151 F.3d at 506. While this standard is lower than when evaluating the sufficiency of the evidence for judgment as a matter of law, *see* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806 (2d ed. 1995), the standard is still rigorous, because in finding that a jury's verdict was against the weight of the evidence, the judge must, "to some extent at least, substitute[] his judgment of the facts and the credibility of the witnesses for that of the jury." *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967). [**22]   As noted above, the evidence Miller presented to show Alldata's discrimination against her was sufficient to support the jury's verdict; it was also sufficient, accordingly, for Miller to survive Alldata's motion for a new trial.

Alldata next argues the district court entered several erroneous evidentiary rulings that, singly or in combination, worked to its prejudice and denied it a fair trial. Specifically, Alldata points to the following rulings: (1) denial of Alldata's motion for leave to amend its answer; (2) grant of Miller's motions in limine; (3) denial of Alldata's motions in limine; and (4) refusal to give certain requested jury instructions.

With regard to Alldata's motion for leave to amend, Alldata contends that, after [*465] it fired Miller, she stole a company computer containing confidential information. Alldata contends the after-acquired evidence rule required the district court to grant the company leave to amend its answer to assert this defense. The after-acquired evidence rule, which this Court first applied in the employment discrimination context in *Johnson v. Honeywell Information Sys., Inc.*, 955 F.2d 409 (6th Cir. 1992), holds that an employer [**23] can escape liability for its discriminatory actions if the company learns, after the fact, of an otherwise legitimate reason for having taken the adverse employment action.

In its order denying leave to amend, the district court concluded that the use of after-acquired evidence to limit a plaintiff's damages was appropriate only if "the wrong-

doing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge" (quoting *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 363, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995)). Miller's alleged misconduct did not occur until after she was fired. Because Alldata could not have known about the allegedly stolen computer before it terminated Miller, the district court was correct in concluding that Alldata's motion for leave to amend was not well-taken.

With regard to evidentiary rulings, the district court granted two of Miller's motions in limine before the start of trial. The first ruling precluded Alldata from introducing evidence that Miller stole the computer; the second ruling prevented introduction of a memorandum written by [**24] her subsequent employer, Anderson Corporation, stating her job was in jeopardy due to poor performance. The first ruling was correct for the reason noted above regarding after-acquired evidence; the second was correct because the memorandum was hearsay and also because Alldata had not produced it during discovery. The district court also denied two of Alldata's motions in limine -- one seeking to exclude Evangelist's testimony that Weiffenbach was a "chauvinist," and another seeking to exclude Miller's testimony that Alldata and Weiffenbach "discriminated against" her. Alldata argues that "conclusory labels of discrimination do not show pretext and merely inflame or prejudice the jury." However, "[HN10]testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). Furthermore, Rule 701 states that a lay witness may offer opinion testimony if those opinions are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Both this Court and Michigan courts have held it is not [**25] error to allow a lay witness to express an opinion regarding discrimination in an employment setting as long as the opinion complies with the requirements of Rule 701. *See Torres v. County of Oakland, Mich.*, 758 F.2d 147, 149-50 (6th Cir. 1985); *Wilson v. General Motors Corp.*, 183 Mich. App. 21, 35, 454 N.W.2d 405, 413 (1989). The district court was well within its discretion in refusing to exclude Evangelist's and Miller's testimony. In any event, we are certain that the district court's evidentiary rulings did not deprive Alldata of a fair trial.

Finally, Alldata contends the district court erred in refusing to give several proposed jury instructions. This Court reviews a district court's refusal to give requested jury instructions for an abuse of discretion. *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir.

2000). [HN11]Although trial courts have broad discretion in framing jury instructions, state law determines the substance of jury instructions in a diversity action, while federal procedural [*466] law governs questions regarding the propriety of the instructions. *Id.*

Alldata asserts the district court committed error [**26] when it refused to: (1) instruct the jury as to the definition of an adverse employment action in Michigan; (2) give an instruction regarding "equal pay for equal work;" (3) give an instruction regarding what was required to show pretext; (4) read certain instructions addressing standards of sexual harassment; (5) read instructions regarding an employer's liability for tolerating sexual harassment under California law; (6) instruct the jury regarding Alldata's "honest belief" that Miller engaged in inappropriate conduct; and (7) instruct the jury regarding situations when "the hirer and firer are the same individual." Without addressing each of these claimed errors individually, it suffices to say that the instructions given by the district court, taken as a whole, accurately stated the law, and the district court did not abuse its discretion in refusing to give different or additional instructions. Our review of the charge conference reveals the district court was careful to ensure that the instructions it did give to the jury did not favor either side. Alldata's requested instructions were either superfluous in light of the Michigan Standard Jury Instructions given, irrelevant in [**27] light of the evidence, or simply an incorrect statement of the law.

In sum, we find that none of Alldata's asserted bases for grant of a new trial are well-taken, and the trial court did not abuse its discretion when it denied the motion.

III. Alldata's Motion for Remittitur.

A. The $ 300,000 Emotional Distress Damage Award.

Alldata also appeals the district court's denial of its motion to remit the jury verdict. [HN12]This Court reviews the denial of remittitur for an abuse of discretion. *Slayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000). [HN13]A district court should reduce a jury's award of damages only when the judgment "clearly exceeds" the maximum damages a reasonable jury could find to compensate the plaintiff's loss. *Id.* Thus, we may reduce a jury award only if it is: (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of a mistake. *Id.* Moreover, the excessiveness of a verdict is primarily a "matter . . . for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses." *Id.* (citing *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir. 1986)). [**28]

[HN14]Under Michigan law, "victims of discrimination may recover for the humiliation, embarrassment, disappointment, and other forms of mental anguish which flow from the discrimination." *Howard v. Canteen Corp.*, 192 Mich. App. 427, 435-36, 481 N.W.2d 718, 723 (1992). Nonetheless, Alldata contends Miller presented no competent evidence from which a jury could infer that she suffered emotional distress as a result of her firing. Alldata asserts that "Miller called no witness to testify, and conceded that she received no medical treatment and had no documentation, to establish that she suffered emotional distress as a result of her termination." Michigan law, however, does not require that Miller present any of this particular evidence. For example, "medical testimony substantiating the claim is not required. When a verdict is within the range of evidence produced at trial it should not be reversed as excessive." *Id.* at 435-36, 481 N.W.2d at 723; *see Wilson*, 183 Mich. App. at 40, 454 N.W.2d at 415 (even though the plaintiff presented no "expert testimony regarding her mental distress but only testimony as to her own subjective feelings," the [**29] appellate court allowed the $ 375,000 award -- remitted by the trial [*467] court from $ 750,000 -- of non-economic damages to stand).

Miller did testify that she suffered emotional distress as a result of her treatment by Weiffenbach. She testified she began having sleepless nights, and sought medical treatment for stomach problems that developed during her employment with Alldata. Miller claimed her firing negatively affected her family life, that she was a "wreck," and that she "took it out on [her] boys and [her] grandchildren." She also described the difficulty of dealing with the loss of income and benefits from her position at Alldata.

In 1995, the Michigan Court of Appeals suggested that [HN15]*any* competent evidence of emotional damages would be enough to sustain a jury verdict. "Because evidence of emotional damage was presented at trial, and the award was comparable to awards in similar cases, the trial court properly deferred to the jury and denied defendant's motions." *Paulitch v. Detroit Edison Co.*, 208 Mich. App. 656, 659, 528 N.W.2d 200, 203 (1995), *appeal denied*, 453 Mich. 970, 574 N.W.2d 28 (1996). The evidence in *Paulitch* primarily [**30] included the plaintiff's own testimony that his "relationships with his wife and friends suffered after he was passed over for [a] promotion" because of discrimination at the hands of his employer. *Id.* The jury awarded the plaintiff $ 359,000 in economic and emotional distress damages, which the appellate court upheld.

Put simply, the jury's emotional distress damage award in this case appears to be within the realm of other verdicts in comparable cases upheld by the Michigan appellate courts and this Court. *See, e.g., Lilley v. BTM Corp.*, 958 F.2d 746, 754 (6th Cir. 1992), *cert. denied*, 506 U.S. 940, 121 L. Ed. 2d 287, 113 S. Ct. 376 (1992) (upholding a verdict of $ 350,000 for emotional distress damages flowing from the employer-defendant's violation of the Elliott-Larsen Civil Rights Act). Accordingly, we conclude the district court did not abuse its discretion in denying Alldata's motion for remittitur of the emotional distress damage award.

B. The $ 16,000 Economic Damage Award.

Alldata also challenges the jury's award of $ 16,000 to Miller for economic loss resulting from her termination. Miller testified at trial that, after she was [**31] fired by Alldata, she lost salary she would have earned, was unemployed for three months, and lost her subsequent job at Anderson Corporation due to her litigation against Alldata. An expert witness testified that, based on Miller's earnings history, the actuarial present value of her lost wages and benefits from Alldata was between $ 339,000 and $ 696,000. While the jury awarded Miller only $ 16,000 in economic damages, the district court appears to have been well within its discretion in denying remittitur of that amount.

IV. Miller's Motion for Attorney's Fees, Costs, and Interest.

The district court granted Miller attorney's fees, costs, and interest in the amount of $ 177,628.29. [HN16]This Court reviews a district court's award of attorney's fees and costs for an abuse of discretion. *Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir. 2001); *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 312 (6th Cir. 1997). An abuse of discretion exists when this Court is firmly convinced that a mistake has occurred or when the district court relied on clearly erroneous findings. *Harrison v. Metropolitan Govt. of Nashville and Davidson County, Tenn.*, 80 F.3d 1107, 1112-13 (6th Cir. 1996), [**32] *cert. denied*, 519 U.S. 863, 136 L. Ed. 2d 111, 117 S. Ct. 169 (1996); *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995). [*468]

In this diversity case, Michigan law governs whether an award of attorney's fees was appropriate. *Big Yank Corp.*, 125 F.3d at 312 n.5. [HN17]As a general rule, a federal court may not award attorney's fees to the prevailing party unless a statute or binding contract authorizes such a recovery. *Hall v. Cole*, 412 U.S. 1, 4-5, 36 L. Ed. 2d 702, 93 S. Ct. 1943 (1973). The Elliott-Larsen Act does give the district court authority to award litigation costs and reasonable attorney's fees. Mich. Comp. Laws § 37.2802 (2000).

[HN18]The "lodestar" figure of hours spent multiplied by the hourly rate is presumed to be the reasonable

attorney's fee. *Schellenberg v. Rochester, Michigan Lodge No. 2225 of the Benevolent and Protective Order of Elks of the U..S.A., 228 Mich. App. 20, 53, 577 N.W.2d 163, 177 (1998).* Further, the district court considers the following factors when calculating the reasonableness of attorney's fees: "(1) the professional standing and experience of the attorney; (2) [**33] the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." *Employees and Judge of the Second Judicial Dist. Ct., Second Div. v. Hillsdale County, 423 Mich. 705, 750-51, 378 N.W.2d 744, 762 (1985).*

Here, Miller's petition for an award of costs and fees included: (1) an itemized bill setting forth the date, description of work, and attorney and staff hours spent on this case; (2) the affidavits of Miller's attorneys setting forth their experience and qualifications, and attesting to the accuracy of their bill; (3) the Martindale-Hubbell listings for those attorneys; (4) excerpts from the Michigan Bar Journal's December 1997 Law Firm Economics Survey, which placed the rates charged by Miller's attorneys within the 75th to 95th percentile of rates charged by attorneys in the Detroit area; and (5) the client ledger card reflecting costs of this litigation.

In a post-trial hearing, the district court examined Miller's attorneys' documentation of their fees and addressed each of the *Hillsdale County* [**34] factors in turn. The court found that counsel's rates were reasonable and that Miller's case required extensive time and labor. The district court also referred to the paltry settlement offer made by the defendants. Given the defendants' settlement posture and the significant burden Miller bore in proving gender discrimination by Alldata, the district court found that Miller won a meaningful victory by proceeding to trial. The district court described the expenses incurred by counsel as "substantial" and found that Miller's two-year professional relationship with her attorneys was significant enough to merit the fees awarded to them.

We find that the district court did not abuse its discretion in awarding $ 177,628.29 in attorney's fees, costs, and interest to Miller.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's denials of Alldata's motions for judgment as a matter of law, new trial, and remittitur, and we also AFFIRM the district court's award of $ 177,628.29 in attorney's fees, costs, and interest to Miller.

LEXSEE



Analysis
As of: Apr 09, 2010

**BRIAN A., by his next friend, BOBBI JEAN BROOKS; TRACY B., by her next friend, PAMELA PALLAS; JACK and CHARLES C., by their next friend, LINDA LLOYD; AMY D., by her next friend, FRANK NOON; DENISE E., by her next friend, LINDA LLOYD; CHARLETTE F., by her next friend, JUANITA VEASY; and TERRY G., by her next friend, CAROL OLDHAM, on their own behalf and on behalf of all others similarly situated, Plaintiffs-Appellees, v. GEORGE W. HATTAWAY, Comissioner of the Tennessee Department of Children's Services; DONALD SUNDQUIST, Governor of the State of Tennessee, Defendants-Appellants.**

No. 02-5666

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

83 Fed. Appx. 692; 2003 U.S. App. LEXIS 24835

November 21, 2003, Filed

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE. 00-00445. Campbell. 04-19-02.
Brian A. by Brooks v. Sundquist, 149 F. Supp. 2d 941, 2000 U.S. Dist. LEXIS 18771 (M.D. Tenn., 2000)

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a class action civil rights suit on behalf of plaintiff minor children against defendant state governor and commissioner, a settlement agreement explicitly provided that the children were prevailing parties and, therefore, entitled to recover attorney fees pursuant to 42 U.S.C.S. § 1988. On appeal, defen-

dants argued that the United States District Court for the Middle District of Tennessee abused its discretion in determining the fee award.

**OVERVIEW:** Defendants argued that the district court abused its discretion in determining the fee award by using an improper hourly rate and by failing to eliminate excessive hours. They contended that it was unreasonable to hire out-of-town specialist attorneys, and that New York attorneys in the case should not be paid the prevailing hourly rate for attorneys in New York City rather than for Nashville attorneys. Defendants offered declarations that Tennessee attorneys had brought four complex civil rights class actions. The children offered affidavits opining that there was no local attorney or coalition of local attorneys who had the resources, expertise, or willingness to bring the instant suit. Under the circumstances, the court of appeals found that the decision to hire out-of-town specialists was reasonable and not an abuse of discretion. Defendants alleged that the case was overstaffed, resulting in inefficiencies and unnecessary duplication of efforts. When faced with specific objections, the district court, which was familiar with the case, reviewed the children's fee petition and twice required them to eliminate excessive hours. There was no abuse of discretion.

83 Fed. Appx. 692, *; 2003 U.S. App. LEXIS 24835, **

**OUTCOME:** The court of appeals affirmed the judgment of the district court.

**CORE TERMS:** hourly rate, out-of-town, specialist', prevailing, excessive, billed, fee award, billing, skill, attorney fees, number of hours, abuse of discretion, reputation, expended, abused, hire, prevailing market rate, fee request, compensable, awarding, per hour, specific objections, out-of-state, objected

## LexisNexis(R) Headnotes

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Appellate Review*
[HN1]A trial court has discretion in making the equitable judgments regarding an award of attorney fees under 42 U.S.C.S. § 1988. A trial court's fee award is entitled to substantial deference due to the trial court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. Accordingly, an appellate court reviews such awards for abuse of discretion. An abuse of discretion occurs if the trial court based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence, or the reviewing court is firmly convinced that a mistake has been made.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > General Overview*
[HN2]A court's primary concern in an attorney fee case is that the fee awarded be reasonable. A reasonable fee is one that is adequate to attract competent counsel, but does not produce windfalls for attorneys.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Award Calculations*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Reasonable Fees*
[HN3]The first step in calculating an attorney fee award under 42 U.S.C.S. § 1988 is to multiply the number of hours reasonably expended on the litigation by the reasonable hourly rate.

*Civil Procedure > Venue > General Overview*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Award Calculations*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Reasonable Fees*
[HN4]In determining a reasonable hourly rate for an award of attorney fees under 42 U.S.C.S. § 1988, courts typically look to the prevailing market rate in the relevant community. The United States Court of Appeals for the Sixth Circuit has found that the prevailing market rate is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than a foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices. A court may, however, award a higher hourly rate for an out-of-town specialist if (1) hiring the out-of-town specialist was reasonable in the first instance, and (2) if the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation.

*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Award Calculations*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Reasonable Fees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Statutory Attorney Fee Awards*
[HN5]In the context of the reasonableness of an award of attorney fees under 42 U.S.C.S. § 1988, counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. Hours that are not properly billed to one's client are not properly billed to one's adversary pursuant to statutory authority.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Reasonable Fees*
*Civil Rights Law > Practice & Procedure > Costs & Attorney Fees > Statutory Attorney Fee Awards*
[HN6]In the context of the reasonableness of an award of attorney fees under 42 U.S.C.S. § 1988, in determining whether a prevailing party used poor billing judgment, a court of appeals looks to see whether the district court, based on experience and the record in the case, misapplied the reasonable billing practices of the profession.

**COUNSEL:** For BRIAN A., BOBBI JEAN BROOKS, TRACY B., PAMELA PALLAS, JACK C., CHARLES C., LINDA LLOYD, AMY D., FRANK NOON, DE-

83 Fed. Appx. 692, *; 2003 U.S. App. LEXIS 24835, **

NISE E., CHARLETTE F. F., JUANITA VEASY, TERRY G., CAROL OLDHAM, Plaintiffs - Appellees: David L. Raybin, Hollins, Wagster & Yarbrough, Nashville, TN.

For BRIAN A., BOBBI JEAN BROOKS, TRACY B., PAMELA PALLAS, JACK C., CHARLES C., LINDA LLOYD, AMY D., FRANK NOON, DENISE E., CHARLETTE F. F., JUANITA VEASY, TERRY G., CAROL OLDHAM, Plaintiffs - Appellees: Marcia R. Lowry, Jeffrey K. Powell, Marcia R Lowry, Children's Rights, Inc., New York, NY.

For BRIAN A., BOBBI JEAN BROOKS, PAMELA PALLAS, CHARLES C., LINDA LLOYD, AMY D., FRANK NOON, DENISE E., CHARLETTE F. F., JUANITA VEASY, TERRY G., CAROL OLDHAM, Plaintiffs [**2] - Appellees: Ira P. Lustbader, Children's Rights, Inc., New York, NY.

For GEORGE W. HATTAWAY, DONALD SUNDQUIST, Defendants - Appellants: Dianne Stamey Dycus, Asst. Attorney Gen., Douglas E. Dimond, Elizabeth C. Driver, Office of the Attorney General, Nashville, TN.

**JUDGES:** Before: MOORE and ROGERS, Circuit Judges; FORESTER, District Judge. *

    * The Honorable Karl S. Forester, United States Chief District Judge for the Eastern District of Kentucky, sitting by designation.

**OPINION BY:** Rogers

**OPINION**

[*693] **ROGERS, Circuit Judge.** The instant case arises out of a class action suit filed against the state of Tennessee on behalf of children in the custody of the Tennessee Department of Children's Services. The appellees, the plaintiffs below, alleged that Tennessee's foster care system violated the constitutional and statutory rights of the children in its care. The case was settled, and the settlement agreement explicitly provided that the plaintiffs were prevailing parties and, therefore, entitled to recover attorney fees pursuant to 42 U.S.C. § 1988. The district court awarded the plaintiffs $ 1,524,357.99 in fees and expenses. The defendants below appeal, [**3] arguing that the district court abused its discretion in determining the fee award by using an improper hourly rate and by failing to eliminate excessive hours. We affirm the district court.

*I. Background*

The plaintiffs initially requested a total of $ 1,629,327.57 in fees and expenses for the work of two law firms -- Children's Rights, Inc. ("CRI"), located in New York City, and Hollins, Wagster and Yarbrough, a firm located in Nashville, Tennessee. The fee request was based on hourly rates ranging from $ 175.00 per hour to $ 375.000 per hour for the more than 6,900 hours billed. The defendants objected to the sum requested, arguing that the hourly rates requested were excessive, the number of hours billed was unreasonable, and the expenses billed were unreasonable. Specifically, the defendants argued that, for work done by CRI attorneys, the plaintiffs improperly requested reimbursement at the prevailing hourly rate for attorneys in New York City rather than the prevailing hourly rate for attorneys in Nashville. The district court granted the plaintiffs' motion in part and denied it in part. While the district court explicitly approved the hourly rates sought by the plaintiffs, [**4] the court denied the plaintiffs' request for compensation for certain categories of work and expenses. The district court directed the plaintiffs to file an amended motion for fees and expenses.

The plaintiffs filed an amended motion for fees and expenses. The defendants again objected, and the district court again disallowed certain items. The district court directed the plaintiffs to file a second [*694] amended request for fees and expenses, which the plaintiffs did. The district court granted the motion and awarded fees and costs to the plaintiffs in the amount of $ 1,524,357.99. The defendants filed the instant appeal.

*II. Standard of Review*

[HN1]A trial court has discretion in making the equitable judgments regarding an award of attorney fees under 42 U.S.C. § 1988. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983). A trial court's fee award is entitled to substantial deference due to the trial court's "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters ...." *Hadix v. Johnson,* 65 F.3d 532, 534 (6th Cir. 1995) (quoting [**5] *Hensley,* 461 U.S. at 437). Accordingly, an appellate court reviews such awards for abuse of discretion. *Id.* An abuse of discretion occurs if the trial court "based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence," *Apostolic Pentecostal Church v. Colbert,* 169 F.3d 409, 417 (6th Cir. 1999), or "the reviewing court is firmly convinced that a mistake has been made." *Adcock-Ladd v. Sec'y of the Treasury,* 227 F.3d 343, 349 (6th Cir. 2000). *See also Bowling v. Pfizer, Inc.,* 102 F.3d 777, 780 (6th Cir. 1996) ("Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment.") (citation omitted).

Page 3

83 Fed. Appx. 692, *; 2003 U.S. App. LEXIS 24835, **

*III. Analysis*

[HN2]A court's primary concern in a fee case is that the fee awarded be reasonable. *See generally Blum v. Stenson,* 465 U.S. 886, 893, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). "A reasonable fee is one that is adequate to attract competent counsel, but ... [does] not produce windfalls for attorneys." *Hadix v. Johnson,* 65 F.3d 532, 535 (6th Cir. 1995) (internal quotations omitted). [HN3]The first [**6] step in calculating an attorney fee award under 42 U.S.C. § 1988 is to multiply the number of hours reasonably expended on the litigation by the reasonable hourly rate. *Blum,* 465 U.S. at 888; *Adcock-Ladd,* 227 F.3d at 349. The defendants contend that the district court abused its discretion in determining both the number of hours reasonably expended and the reasonable hourly rate.

*A The district court did not abuse its discretion by awarding attorney fees for CRI attorneys based on out-of-state hourly rates.*

The district court did not abuse its discretion in awarding the hourly rates sought by the plaintiffs. [HN4]In determining a "reasonable hourly rate," courts typically look to the "prevailing market rate in the relevant community." *Adcock-Ladd,* 227 F.3d at 350 (quoting *Blum,* 465 U.S. at 895). The Sixth Circuit has found that "the 'prevailing market rate' is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than a foreign counsel's typical charge for work performed within a geographical area wherein [**7] he maintains his office and normally practices ...." *Id.* A court may, however, award a higher hourly rate for an out-of-town specialist if (1) hiring the out-of-town specialist was reasonable in the first instance, and (2) if the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation. *Hadix,* 65 F.3d at 535.

The defendants do not contend that the rates sought by the CRI attorneys are unreasonable for attorneys of their degree of skill, experience, or reputation; rather they argue that it was unreasonable to hire an out-of-town specialist. The district court noted that it had reviewed both parties' [*695] submissions, and concluded, "With regard to the use of New York billing rates for out-of-town counsel, the Court finds that the use of an 'out-of-town specialist' was reasonable in the first instance and that the rates sought by out-of-town specialists are reasonable for an attorney of like degree and skill, experience and reputation." ⁱ The record included declarations by prior Tennessee Attorneys General, submitted by the defendants, referring to four complex civil rights class actions [**8] brought by Tennessee attorneys. The plaintiffs submitted affidavits from Tennessee experts in child and family law, who were familiar with the issues involved in the case and opined that there was no local attorney or coalition of local attorneys who had the resources, expertise, or willingness to bring the instant suit. While an independent review of this record would lead to some disagreement among members of this panel as to whether it was reasonable to hire out-of-state lawyers at more than double the local rate, we agree that under the deferential standard we are required to apply, the district court did not abuse its discretion in finding that the plaintiffs' decision to hire out-of-town specialists was reasonable.

> 1   While the district court was required to provide a "clear and concise explanation of its reasons for the fee award," *Hadix,* 65 F.3d at 535 (citing *Hensley,* 461 U.S. at 437), given the limited evidence before it, the district court's failure to engage in extended analysis of its reasoning did not constitute an abuse of discretion.

*[**9] B. The district court did not abuse its discretion in determining the number of compensable hours.*

The district court also did not abuse its discretion in determining the number of compensable hours. The defendants contend that counsel for the plaintiffs exercised poor billing judgment, because the case was allegedly overstaffed, resulting in inefficiencies and unnecessary duplication of efforts. *See Hensley,* 461 U.S. at 434 [HN5]("Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary .... Hours that are not properly billed to one's client are not properly billed to one's adversary pursuant to statutory authority.") [HN6]In determining whether a prevailing party used poor billing judgment, this court "look[s] to see whether the District Court, based on experience and the record in the case, misapplied the reasonable billing practices of the profession." *Coulter v. Tenn.,* 805 F.2d 146, 151 (6th Cir. 1986).

The defendants do not object to particular time entries. Instead, they argue that the overall time expended by plaintiffs' counsel on various [**10] activities was excessive. When faced with specific objections, the district court -- which was familiar with the case -- reviewed the plaintiffs' fee petition and twice required the plaintiffs to eliminate excessive hours. While the eliminated hours constituted only a small percentage of the total hours claimed, absent more specific objections, we cannot say that the district court abused its discretion in refusing to reduce further the billable hours.

*IV. Conclusion*

The judgment of the district court is AFFIRMED.

LEXSEE


Caution
As of: Apr 09, 2010

**ENTERTAINMENT SOFTWARE ASSOCIATION, VIDEO SOFTWARE DEAL-
ERS ASSOCIATION, and MICHIGAN RETAILERS ASSOCIATION, Plaintiffs,
vs. JENNIFER M. GRANHOLM, in her official capacity as Governor of the State of
Michigan; MICHAEL A. COX, in his official capacity as Attorney General of the
State of Michigan; and KYM L. WORTHY, in her official capacity as Wayne
County Prosecutor, Defendants.**

**Case No. 05-73634**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION**

**2006 U.S. Dist. LEXIS 96429**

**November 30, 2006, Decided
November 30, 2006, Filed**

**PRIOR HISTORY:** Entm't Software Ass'n v. Gran-
holm, 426 F. Supp. 2d 646, 2006 U.S. Dist. LEXIS
24733 ( E.D. Mich., 2006)

**CORE TERMS:** block, billing, rates charged, billed,
reduction, National Law Journal, paralegal, preliminary
injunction, time spent, hourly fee, across-the-board, re-
imbursement, duplicative, expertise, vague, staff, dupli-
cation, law firms, video games, reasonable fees, prevail-
ing rate, supplemental briefs, large number, travel time,
reasonableness, out-of-state, injunction, litigating, pre-
vailed, benchmark

**COUNSEL:**  [*1] For Entertainment Software Associa-
tion, Video Software Dealers Association, Michigan Re-
tailers Association, Plaintiffs: Alicia J. Blumenfeld,
Dennis J. Levasseur, LEAD ATTORNEYS, Bodman,
Detroit, MI; Paul M. Smith, LEAD ATTORNEY, Jenner
& Block, Washington, DC.

For Jennifer M. Granholm, in her official capacity as
Governor of the State of Michigan, Michael A. Cox, in
his official capacity as Attorney General of the State of
Michigan, Defendants: Denise C. Barton, LEAD AT-
TORNEY, MI Dept of Atty Gen, Public Employment,
Elections and Torts Division, Lansing, MI; Jason R. Ev-
ans, MI Dept of Attorney General, Lansing, MI.

For Kym L. Worthy, in her official capacity as Wayne
County Prosecuting Attorney, Defendant: Denise C. Bar-
ton, LEAD ATTORNEY, MI Dept of Atty Gen, Public
Employment, Elections and Torts Division, Lansing, MI.

**JUDGES:** George Caram Steeh, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** George Caram Steeh

**OPINION**

*ORDER GRANTING PLAINTIFFS' MOTION FOR AT-
TORNEY FEES AND COSTS*

This matter is before the Court following Entertain-
ment Software Association's (ESA), Video Software
Dealers Association's (VSDA), and Michigan Retailers
Association's (MRA) (hereafter referred to as "plain-
tiffs") successful challenge to Part  [*2] II of 2005 Mich.
Public Act 108 ("the Act"). Plaintiffs brought this case
under 42 U.S.C. § 1983, contending that the restriction
on the sale or rental of "ultra-violent explicit video
games" violated the First Amendment of the United
States Constitution and was unconstitutionally vague.
This Court granted plaintiffs' request for a preliminary
injunction against enforcement of the Act on November
9, 2005, and on March 31, 2006 granted a permanent

injunction barring enforcement of the Act, on the basis that it violates the First and Fourteenth Amendments. Plaintiffs now seek attorneys' fees, expenses and costs for their successful prosecution of this action. Plaintiffs seek fees of $ 188,760 for Jenner & Block, and $ 33,168.75 for Bodman, for a total fee of $ 221,928.75. Plaintiffs also seek costs of $ 8,245.18 for Jenner & Block and $ 3,061.08 for Bodman, for a total of $ 11,306.26. In all, plaintiffs seek a total award of $ 233,235.01 in fees and expenses.

The Court previously held that it was reasonable for plaintiffs to hire out-of-town counsel Jenner & Block due to their expertise in the issues involved in this litigation and because of their involvement in representing the video [*3] game industry in several other cases involving similar laws. The issue presently before the Court is the reasonableness of the rates sought, and in particular the prevailing rate in the Washington D.C. market, which has been the subject of supplemental briefs.

I. *Number of Hours Billed*

A. *Duplication of Efforts*

Defendants object to the fact that Jenner & Block staffed the case with six attorneys and five paralegals. Plaintiff's local counsel, Bodman LLP, staffed the case with an additional three attorneys. Defendant is concerned with hours billed due to the large number of staff involved in the litigation, a practice warned against by Judge Duggan in *Gratz v. Bollinger*, 353 F.Supp.2d 929, 942. For example, many of Jenner & Block's entries include time billed for telephone conferences, meetings and e-mails between the staff working on the case. Defendant argues for an across-the-board reduction of at least 5% for such duplicative services. *Id.*

Similarly, defendants object to work performed by Bodman that appears to be duplicative. Specifically, much of Bodman's billings involve reviewing documents already reviewed and billed by Jenner & Block attorneys. The *Gratz* Court reduced the secondary [*4] firm's hours by 10% due to similar duplicative efforts. *Id. at 943.*

The Court agrees that the large number of plaintiff's attorneys and paralegals involved in this litigation undoubtedly lead to an increase in the time spent communicating within the litigation team, as well as an unavoidable duplication of efforts. The Court, therefore, imposes an across-the-board reduction in hours billed of 5%, based upon a duplication of efforts.

B. *Vague Billing Entries and Block Billing*

Defendants object to several entries by both law firms as either vague or block billing, where it is impossible for the court to verify the reasonableness of the billing. The *Gratz* Court made a 10% reduction in the fees requested for similar billing issues. However, the problem with block billing in *Gratz*, that aggregation prevented separation of time spent on issues on which plaintiffs prevailed from those on which they did not, is not present in this case where plaintiffs prevailed on all issues.

Defendants also oppose paying $ 600 for the admission fee required for Jenner & Block's attorneys to be admitted to practice in this court when plaintiffs also retained local counsel. Plaintiffs respond that the admission [*5] fee of $ 200 for attorney Paul Smith, as well as his expenses to Detroit for oral argument, were reasonably incurred given that the was lead counsel in the case. Plaintiffs are willing to withdraw their request of $ 400 in admission fees for attorneys other than Mr. Smith. The Court will, therefore, reduce Jenner & Block's expenses requested by $ 400.

C. *Fees for Travel*

The *Gratz* court awarded only 50% of the out-of-state attorneys' travel time because defendants should not have to bear additional costs incurred because plaintiffs' counsel are located in different cities. *Id.* at 943. This Court has already ruled that hiring out-of-state counsel was reasonable, so reimbursement for their travel time is also reasonable.

D. *Excessive Time*

The court decided this case prior to interrogatories, depositions, or any other discovery being issued. Neither party had hired expert witnesses in this case and no evidentiary hearing was held. The case dealt almost exclusively with First Amendment law, an area in which Jenner & Block claims to have substantial expertise. Given Jenner & Block's extensive specialization and expertise, defendants question why it took six experienced attorneys a [*6] combined total of 479.5 hours; and five paralegal staff a combined total of 41.25 hours. Defendants also question why Jenner & Block needed a local firm to contribute to the "substantive aspects of the case, including the development of Plaintiffs' legal strategy."

There is extensive similarity between plaintiffs' pleadings and documents in this case and the Illinois case, also handled by Jenner & Block. Over 60% of the of the numbered paragraphs in the Complaint filed in this case are identical to the Complaint submitted in Illinois. Over 60% of the paragraphs contained in plaintiff's Memorandum in Support of Motion for Preliminary Injunction filed in this case are similar or identical to paragraphs in the Illinois Memorandum in Support of Motion for Preliminary Injunction.

2006 U.S. Dist. LEXIS 96429, *

The Court recognizes that the plaintiffs were required to consider the specifics of Michigan law in responding to the State's particular arguments in support of its motion to dismiss, motion to transfer venue, opposition to plaintiff's motion for preliminary injunction and summary judgment pleadings. However, the differences between Michigan and Illinois law and the particular Acts at issue do not support the excessive [*7] time spent drafting and preparing documents in this case. The Court orders an across-the-board reduction by 20% of the hours requested by Jenner & Block and Bodman in this case, in addition to the 5% reduction in paragraph 1A above.

## II. *Rates Charged*

To calculate the "reasonable hourly rate" component of the lodestar calculation, the Supreme Court has instructed district courts to assess the "prevailing market rate in the relevant community." *Blum v. Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984).* This Court has previously found that it was reasonable to hire Jenner & Block, and requested supplemental briefs on the prevailing rates in the Washington, D.C. market.

The Court has reviewed and considered the 2005 National Law Journal Survey of rates charged by Washington, D.C.-based law firms, the Altman Weil Survey of standard billing rates for Washington, D.C. firms, and the Laffey Matrix, which has been approved of as a benchmark for reasonable fees in the Washington, D.C. area by the District of Columbia District Courts. *McDowell v. Government of D.C., 2006 U.S. Dist. LEXIS 46371, 2006 WL 1933809 (D.D.C. 2006)* (citing *Muldrow v. Re-Direct, Inc., 397 F.Supp.2d 1, 3 (D.D.C. 2005)*).

The rates charged by the Jenner & Block attorneys [*8] are within the ranges appearing in the National Law Journal Survey, and are within or slightly above the rates in the Altman Weil Survey. The Jenner & Block rates charged are all above the fees described as reasonable by the Laffey Matrix. For example, Katherine Fallow from Jenner & Block had eight to ten years experience and billed at a rate of $ 425 per hour in 2005. For the same level of attorney experience, the National Law Journal shows a range of $ 250 to $ 1,000; the Altman Weil Survey shows a range of $ 404 to $ 450; and the Laffey Matrix gives the billable rate of $ 290.

While the Court recognizes that Washington D.C. courts have approved of the Laffey Matrix as a benchmark for reasonable fees in the area, the National Law Journal and Altman Weil Survey demonstrate that the hourly rates charged by Jenner & Block are comparable to the rates charged by attorneys of similar experience and at firms of similar size. The Court approves of the rates charged by Jenner & Block as reasonable and will not disturb those rates.

## III. *Reimbursement for Fee Petition*

Plaintiffs argue they are entitled to their costs in litigating the fee petition itself, *Coulter v. State of Tenn., 805 F.2d 146, 151 (6th Cir. 1986),* [*9] and request an additional 3% of the total hourly fee as reimbursement. Alternatively, plaintiffs reserve the right to supplement the record with evidence of their actual costs, which allegedly exceed 3% of the total hourly fee that the Sixth Circuit authorizes. *Id.*

## IV. *Attorney Fee and Expense Award*

The chart below shows the legal fees recoverable by plaintiffs, after reducing the hours billed by 25%:

| JENNER & BLOCK ATTORNEYS | RATE-05 | HRS | RATE-06 | HRS | TOTAL |
|---|---|---|---|---|---|
| Paul M. Smith | $ 585 | 28.31 | $ 600 | 15.94 | 26,125.35 |
| Katherine A. Fallow | $ 425 | 69.19 | $ 450 | 10.31 | 34,045.25 |
| Amy L. Tenney | $ 340 | 123.94 | $ 385 | 0.19 | 42,212.75 |
| Kathleen R. Hartnett | $ 340 | 19.31 | N/A | 0 | 6,565.40 |
| Matthew S. Hellman | $ 275 | 32.25 | $ 325 | 39.56 | 21,725.75 |
| Duane Pozza | $ 275 | 20.25 | $ 325 | 0.38 | 5,692.25 |
| JENNER & BLOCK PARALEGALS | RATE-05 | HRS | RATE-06 | HRS | TOTAL |
| Cheryl L. Olson | $ 210 | 9.38 | $ 225 | 3.38 | 2,730.30 |
| Helder G. Agostinho | $ 110 | 12.75 | N/A | 0 | 1,402.50 |
| Juva J. Hepburn | $ 210 | 4.5 | N/A | 0 | 945.00 |
| Christopher C. Carrillo | N/A | 0 | $ 120 | 0.75 | 90.00 |
| Tricia J. Peavler | $ 210 | 0.19 | N/A | 0 | 39.90 |

2006 U.S. Dist. LEXIS 96429, *

| JENNER & BLOCK SUBTOTAL: | | | | | $ 141,574.45 |
|---|---|---|---|---|---|
| BODMAN LLP ATTORNEYS | RATE-05 | HRS | RATE-06 | HRS | TOTAL |
| Dennis Levasseur | $ 320 | 44.81 | $ 335 | 6.56 | 16,536.80 |
| Alicia Blumenfeld | $ 155 | 44.81 | $ 165 | 7.13 | 8,122.00 |
| Michelle Carter | $ 165 | 1.31 | N/A | 0 | 216.15 |
| BODMAN LLP SUBTOTAL: | | | | | $ 24,874.95 |
| FEES TOTAL: | | | | | $166,449.40 |

After reducing [*10] Jenner & Block's expenses by $ 400, total expenses will be awarded to plaintiff in the amount of **$ 10,906.26** ($ 7,845.18 for Jenner & Block and $ 3,061.08 for Bodman LLP).

Costs for litigating the fee petition will be awarded to plaintiff in an amount equal to 3% of the total hourly fees, or **$ 4,993.48.**

It is so ordered.

Dated: November 30, 2006

S/ George Caram Steeh

UNITED STATES DISTRICT JUDGE