UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL-MATEX TANK )
TERMINALS-ILLINOIS, )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　Plaintiff, )　　Case No. 1:08-cv-1200
　　　　　　　　　　　　　　　　　　 )
v. )　　Honorable Paul L. Maloney
　　　　　　　　　　　　　　　　　　 )
CHEMICAL BANK, )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　Defendant. )
_____)

**REPORT AND RECOMMENDATION ON DAMAGES**

This is an action for wrongful dishonor of a letter of credit brought pursuant to U.C.C. § 5-111, MICH. COMP. LAWS § 440.5111. Plaintiff is International Matex Tank Terminals-Illinois (IMTT), the beneficiary under an irrevocable, standby letter of credit issued by defendant Chemical Bank on September 13, 2007. The letter of credit, identified as LOC no. 2007-19, was procured by General Sales and Service, Inc., d/b/a Torco Racing Fuels (the "Torco Agreement"), to secure Torco's obligations under a fuel storage tank lease between IMTT and Torco dated September 15, 2006. The bank dishonored four draws by IMTT against the letter of credit. By opinion and order issued October 5, 2009, Chief Judge Paul Maloney granted IMTT a summary judgment declaring the bank liable on the letter of credit. The court's order directed the parties to file a joint notice stating the total amount due to plaintiff as a result of the court's opinion, including pre- and post-judgment interest in attorney's fees as allowed by U.C.C. § 5-111, MICH. COMP. LAWS § 440.5111.

The order provided that in the absence of agreement by the parties, the matter would be referred to me for determination pursuant to 28 U.S.C. § 636(b)(1)(B). (docket # 59, Op. & Order at 21-22).

## Relevant Procedural History

Acting pursuant to the court's summary judgment order, the parties filed a joint notice on the issue of damages on November 23, 2009. (docket # 60). Attached to the joint notice was a statement by IMTT identifying the principal amount owed as $200,000.00, with total accrued pre-judgment interest of $8,903.23, and post-judgment interest (through November 23, 2009) of $173.19. At that time, IMTT claimed approximately $125,000.00 in attorney's fees, for a total award of $333,798.16. The joint statement identified two, and only two, areas of disagreement by defendant concerning the issue of damages. First, the statement indicated that the bank believed that fuel was still contained in the tank at the time the Torco Agreement was terminated and that the value of the alleged remaining fuel should offset any recovery. IMTT denied that any fuel was left and asserted legal arguments against the bank's defense. (The parties and the court have referred to this as the "mitigation of damages" issue.) Second, the joint statement noted the bank's objection to the claimed attorney's fees as excessive. The bank sought an opportunity for further discovery and briefing on the issues, while IMTT argued that the record was complete and no further proceedings should be allowed.

On December 8, 2009, I conducted a telephone status conference with counsel and issued a scheduling order (docket # 64) granting the parties a short time to conduct discovery, limited to the issue of mitigation. On January 19, 2010, the parties filed a joint motion (docket # 65), seeking clarification on the scope of discovery allowed by the previous order. Essentially, the bank

read the order as allowing extensive discovery concerning the underlying contractual relationship between Torco and IMTT, while IMTT believed that the scope of allowable discovery was much more narrow. On January 21, 2010, I conducted a telephone status conference in an unsuccessful effort to resolve the matter informally.

On January 21, 2010, I entered a discovery order (docket # 68) ruling on the joint motion. The discovery order recognized that a beneficiary's failure to mitigate damages is not a defense under U.C.C. § 5-111(1). The U.C.C. provides only that if a claimant, although not obliged to do so, avoids damages, the claimant's recovery from the issuer must be reduced by the amount of damages actually avoided. Therefore, the issue was not whether IMTT should have reduced its loss by selling off fuel remaining in the tank, but whether in fact it had done so. (Discovery Order at 2). In light of the exceedingly limited defense to damages allowed by section 5-111(1), I found that the bank's interrogatories and document requests "wildly exceed the very limited scope of the issue now before the court." (docket # 68 at 2). The order identified four specific factual issues that were the proper subject of discovery. The order provided for discovery as to these four issues, and also allowed the bank access to the Torco Agreement, in certain circumstances. (*Id.*, 3).

After several delays in the proceedings requested by the parties, the court entered a scheduling order for filing of briefs. (docket # 71). The bank filed its motion for a determination of damages on March 19, 2010. (docket # 72). (The bank was directed to file its brief first, because section 5-111(1) of the U.C.C. places the burden on the issuer to establish that the beneficiary has avoided damages.) The bank's brief said nothing about the mitigation issue. Rather, the bank now raises a completely new argument, based upon its review of the Torco Agreement (docket # 72, Ex. A), which the bank had not seen previously. The bank points out that on July 7, 2008, IMTT

terminated the lease on account of Torco's default and then purported to accelerate future lease payments. Relying on paragraph 11 of the lease, the bank argues that IMTT had the option to terminate the Agreement *or* accelerate all monies due, *or* sue for storage charges as they accrued. The bank's essential argument is that IMTT elected its remedies under paragraph 11 of the lease and is entitled to collect only the liquidated damage amount provided for by contract in the event of termination. The bank argues that IMTT was not contractually entitled both to terminate the contract and to accelerate all monies due for the unexpired remaining term. On this basis, Torco argues for a damage award of $28,229.65, and not the full $200,000.00 sought by IMTT. IMTT filed its response (docket # 80) on April 16, 2010, raising procedural, factual, and legal objections to the bank's latest round of arguments. No party has requested an evidentiary hearing or has identified any factual issue in dispute.

Upon review of the record and the submissions of the parties, I conclude that the bank's position is not meritorious and recommend that IMTT be awarded the amount of $200,000.00, plus accrued pre-judgment interest. The calculation of reasonable attorney's fees will be addressed in a separate report and recommendation after briefing on that issue is completed.

**Proposed Findings of Fact**

The facts necessary to resolve the issue of damages are not subject to dispute.

1. On or about September 15, 2006, IMTT and Torco entered into the Torco Agreement (referred to as TOR-L1), under which IMTT agreed to store petroleum products owned by Torco in IMTT's tank storage facilities in Lemont, Illinois. (docket # 72, Ex. A). The term of

the Agreement extended through December 1, 2009. The Agreement (¶ 4) obligated Torco to pay monthly storage charges as established by an attached schedule.

  2.  The Agreement contained the following provision regarding the remedies of IMTT upon default by Torco:

> 11. Should Bailor [Torco] fail to pay any monies due or to become due hereunder or should Bailor fail to comply with any of its other obligations under this Agreement within fifteen (15) days from the mailing by Bailee [IMTT] of notice of such default, Bailee shall have the right, at its option (a) to terminate and cancel the within Agreement in which event there shall be due to Bailee, as liquidated damages, a sum equal to the amount of the storage charges hereunder for one (1) month; (b) to accelerate all monies due for the unexpired remaining term of the within Agreement and to declare same immediately due and payable; or (c) to sue for the storage charges in intervals or as the same accrue. The foregoing provisions are without prejudice to any remedy which might otherwise be available under the laws of Illinois for non-payment of monies due, or to become due hereunder, or for breach of any of the obligations of the within Agreement, or to establish any lien or privilege.

(Agreement, docket # 72, Ex. A at 3).

  3.  To secure its obligations under the Torco Agreement, Torco procured from defendant Chemical Bank Letter of Credit (LOC) 2007-19, dated September 13, 2007, with expiration date September 13, 2008. LOC 2007-19 created drawing rights in favor of IMTT, limited to $200,000.00. The LOC was payable at sight upon presentation of the following documents:

> 1.A) i. COPY(IES) OF ORIGINAL, OR TELECOPIES OF INVOICE(S) ISSUED BY IMTT-LEMONT REQUESTING PAYMENT FROM GENERAL SALES AND SERVICE, INC. DBA TORCO RACING FUELS
>
>     AND
>
>  ii. STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF IMTT-LEMONT STATING THAT THE DRAWING AMOUNT REPRESENTS FUNDS DUE TO IMTT-LEMONT UNDER THE ACCOMPANYING INVOICE(S) WHICH HAVE NOT BEEN PAID BY GENERAL SALES AND SERVICE, INC. DBA TORCO RACING FUELS UNDER THE LEADED RACING FUEL AGREEMENT NO. TOR-L1 AND THAT THE

> SAID INVOICE(S) REMAIN(S) UNPAID AT THE TIME OF DRAWING,
>
> OR
>
> B) STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE OF IMTT-LEMONT STATING THAT THIS LETTER OF CREDIT NO. 2007-19 IS SCHEDULED TO EXPIRE LESS THAN 30 DAYS FROM THE DATE HEREOF AND IMTT-LEMONT HAS NOT RECEIVED A SUITABLE RENEWAL OF THIS LETTER OF CREDIT OR A SUITABLE REPLACEMENT LETTER OF CREDIT AND THEREBY DEMANDS PAYMENT OF THE FULL AMOUNT AVAILABLE UNDER THIS LETTER OF CREDIT.

(LOC 2007-19, docket # 38, Ex. 1).

4. On or about June 19, 2008, IMTT sent Torco a notice of default under paragraph 11 of the Agreement, listing five unpaid invoices aggregating $28,229.65 and informing Torco of its ability to cure the default within fifteen days. (docket # 38, Ex. 2).

5. On July 7, 2008, IMTT transmitted to the bank a draw on LOC 2007-19 in the amount of $28,229.65 (First Draw), supported by a copy of the LOC, the notice of default to Torco dated June 19, 2008, and the five unpaid invoices. (docket # 41, Ex. D).

6. On the same day, IMTT sent Torco a "Notice of Termination," notifying Torco that IMTT elected to "immediately terminate Contract # TOR-L1" and of its election to "accelerate all monies due for the unexpired remaining term of the Agreement." (docket # 72, Ex. D). Attached to the Notice of Termination was Invoice No. LE0807-701 in the amount of $198,187.87, representing accelerated monthly rental of $11,658.11 for a seventeen-month period (August 1, 2008 to December 31, 2009).

7. On June 14, 2008, IMTT sent the bank another draw request (Second Draw), in the amount of $171,770.35, representing the balance of IMTT's $200,000 drawing rights under LOC 2007-19. This draw was based on IMTT's acceleration of the remaining payments under the

Torco Agreement. On July 17, 2008, the bank's counsel requested a copy of the Agreement upon which the invoice was based. (docket # 72, Ex. E). IMTT apparently did not respond to this request.

8. On July 18, 2008, IMTT sent Torco an "amendment" of its July 7 notice (docket # 72, Ex. G). The amendment stated that IMTT was *not* electing to terminate the Agreement, and it canceled Invoice LE0807-701, which had been issued on July 7, 2008, in the amount of $198,187.87. Attached to the amendment was a revised Invoice LE0807-701, bearing the date July 18, 2008, and totaling $231,996.55. The revised invoice repeated the charges of $198,187.87 for eleven months of tank rent (August 1, 2008 to December 31, 2009) and added certain monthly surcharges.

9. On the same day (July 28, 2008), IMTT delivered to the bank a draw for the entire $200,000.00 allowed under LOC 2007-19 (Third Draw), accompanied by invoices to Torco totaling $274,003.09 and the certification of a representative of IMTT that the invoices "remain unpaid at the time of this drawing." (docket # 41, Ex. G).

10. On September 12, 2008, IMTT sent the bank its last draw (Fourth Draw), again demanding the $200,000.00 limit on the LOC. (docket # 72, Ex. I). This draw was not premised on the existence of unpaid invoices, but on the alternative ground for drawing rights set forth in paragraph 1.B of the LOC -- that LOC 2007-19 was scheduled to expire in less than thirty days, and Torco had not provided a suitable replacement LOC.

Chief Judge Maloney has already determined that the bank failed to give proper notice of dishonor and that the bank had not advanced any other valid defense to IMTT's claim for wrongful dishonor. (Op. & Order, docket # 59). The only remaining issue is the amount of recovery.

**Discussion**

A. **Amendment to Add Mitigation Defense**

The first question that Judge Maloney referred to me was whether defendant should be allowed to amend its answer to assert the affirmative defense of mitigation of damages. (Order of Reference, docket # 61, at 5). Although defendant never filed a formal motion to amend, this issue suggested itself as a result of the parties' joint notice on the issue of damages (docket # 60) in which the bank asserted the question of mitigation, and IMTT argued waiver as a result of the bank's failure to plead this affirmative defense. There are numerous procedural and substantive reasons why the court should not allow amendment of the answer to include the defense of mitigation of damages. Discussion of two such grounds will suffice.

First, as a matter of substantive law, mitigation of damages is not a defense available to an issuer in an action for wrongful dishonor of a letter of credit. U.C.C. § 5-111 governs the question:

> If an issuer wrongfully dishonors or repudiates its obligation to pay money under a letter of credit before presentation, the beneficiary, successor, or nominated person presenting on its own behalf may recover from the issuer the amount that is the subject of the dishonor or repudiation. If the issuer's obligation under the letter of credit is not for the payment of money, the claimant may obtain specific performance or, at the claimant's election, recover an amount equal to the value of performance from the issuer. In either case, the claimant may also recover incidental but not consequential damages. *The claimant is not obligated to take action to avoid damages that might be due from the issuer under this subsection. If, although not obligated to do so, the claimant avoids damages, the claimant's recovery from the issuer must be reduced by the amount of damages avoided.* The issuer has the burden of proving the amount of damages avoided. In the case of repudiation, the claimant need not present any document.

MICH. COMP. LAWS § 440.5111(1) (emphasis added). Official comment 1 sets forth the rationale for this rule. Because the value of a letter of credit depends upon speed and certainty of payment,

it is important that the issuer not be given an incentive to dishonor the LOC. Such an incentive would arise if the issuer could rely on a burden of mitigation that falls on the beneficiary. For this reason, the U.C.C. denies the issuer a mitigation defense and places no duty on the beneficiary under a letter of credit to mitigate damages. The only issue is whether the beneficiary has in fact avoided damages, although not under an obligation to do so. U.C.C. § 5-111 cmt. 1. As a result of U.C.C. § 5-111, the mitigation defense is legally unavailable to an issuer of a letter of credit. *See, e.g., San Diego Gas & Elec. Co. v. Bank Leumi*, 50 Cal. Rptr. 2d 20, 25 (Cal. App. 1996) (failure to mitigate damages is an extraneous defense not available to an issuer of a letter of credit). A court properly denies leave to amend a pleading where the proffered claim or defense is meritless. In such circumstances, amendment would be futile. *See Campbell v. BNSF Ry.*, No. 09-5614, ___ F.3d ___, 2010 WL 1404393, at * 9 (6th Cir. Apr. 9, 2010); *Konkol v. Diebold, Inc.*, 590 F.3d 590, 404 (6th Cir. 2009).

The only damage-related issue available to the bank under section 5-111(1) is that IMTT actually avoided damage and that its recovery should be reduced by the amount of damages avoided. Neither the U.C.C. nor any other authority with which I am familiar requires this issue to be pleaded as an affirmative defense. The discovery order of January 21, 2010 (docket # 68), allowed the bank limited discovery on this issue, directed to the question whether any fuel remained in plaintiff's tank after Torco defaulted and, if so, whether plaintiff received any money, credit, or other thing of value for the remaining fuel. The order also allowed the bank discovery on the question whether plaintiff re-leased the tank for any period covered by the original contract with Torco. (Order at 3). This discovery apparently confirmed that IMTT had not received anything of value, whether by selling leftover fuel or by re-leasing the tanks during the term of the Agreement.

The bank has not presented to the court any evidence to support a conclusion that IMTT's damages for wrongful dishonor should be reduced on account of any value received by IMTT.

For the foregoing reasons, I recommend that the answer not be deemed amended to allege the defense of failure to mitigate damages. I further recommend that plaintiff's recovery from the bank not be reduced by any amount on account of the actual avoidance of damage. The bank has simply presented no proof to this court to support a finding in its favor on this issue.

**B.  Defense Arising From Torco Agreement**

Now that the bank has abandoned its mitigation defense, the only asserted defense is based upon the provisions of paragraph 11 of the tank lease between IMTT and Torco. That paragraph governs the rights of IMTT (identified in the contract as "Bailor") and provides in relevant part as follows:

> 11.  Should Bailor [Torco] fail to pay any monies due or to become due hereunder or should Bailor fail to comply with any of its other obligations under this Agreement within fifteen (15) days from the mailing by Bailee [IMTT] of notice of such default, Bailee shall have the right, at its option (a) to terminate and cancel the within Agreement in which event there shall be due to Bailee, as liquidated damages, a sum equal to the amount of the storage charges hereunder for one (1) month; (b) to accelerate all monies due for the unexpired remaining term of the within Agreement and to declare same immediately due and payable; or (c) to sue for the storage charges in intervals or as the same accrue. The foregoing provisions are without prejudice to any remedy which might otherwise be available under the laws of Illinois for non-payment of monies due, or to become due hereunder, or for breach of any of the obligations of the within Agreement, or to establish any lien or privilege.

(Contract No. TOR-L1, docket # 72, at 3). The bank points out that on July 7, 2008, IMTT purported to immediately terminate the contract after fifteen days of an uncured default. On the same day, IMTT sent the bank its First Draw in the amount of $28,229.65. IMTT further purported to accelerate all monies due for the unexpired remaining term of the Agreement, a right that the bank

now argues IMTT did not have because it had already elected to terminate the contract. IMTT thereafter sent the Second and Third Draws, representing accelerated rental payments under the Torco Agreement. The Fourth Draw invoked paragraph 1.B of the LOC, which allowed IMTT to draw "the full amount available" in case Torco failed to procure a suitable replacement LOC. The bank argues that the acceleration was contrary to the provisions of paragraph 11 of the Agreement, that the accelerated payments were never due and owing to IMTT, and that IMTT's termination of the Torco Agreement precludes its recovery on the Second, Third and Fourth Draws.[1]

The bank's reliance on the provisions of the Torco Agreement as a defense to the letter of credit violates the independence principle. As explained by Chief Judge Maloney in his summary judgment opinion, the very purpose of a letter of credit is to assure payment without reference to disputes regarding the underlying contract. (Op. at 17). Under the independence principle, a bank's duty to pay on letters of credit is independent of the question whether the applicant or the beneficiary have properly performed under the underlying contract. *In re Graham Square, Inc.*, 126 F.3d 823, 827 (6th Cir. 1997). Put another way, the bank must pay on a proper demand from the beneficiary even though the beneficiary may have breached the underlying contract with the applicant. 3 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 26-2 at 138 (5th ed. 2008). Under this principle, the issuing bank may only determine whether the appropriate documents have been presented. It may not contest the truth of the assertions in those documents. *Intraworld Indus.,*

---

[1] In response to the bank's latest defense, IMTT raises numerous objections, some of them extravagant. For example, IMTT argues that the bank is procedurally precluded from relying on the Torco Agreement, which IMTT produced in discovery in response to a court order only after the formal discovery period had closed. IMTT relies on a nonexistent rule of law that it says precludes a party's reliance on evidence that has come to light after the close of discovery. By recommending that the court reject the bank's substantive position, I do not endorse all of the objections raised by IMTT.

*Inc. v. Girard Trust Bank*, 336 A.2d 316, 323-24 (Pa. 1975). "Absent its agreement to the contrary, the issuer is, under the general rule, not required *or even permitted* to go behind the documents to determine if the beneficiary has performed in conformity with the underlying contract." *Id.* at 323 (emphasis added).

In light of Judge Maloney's clear rejection of this defense, the bank's dogged reassertion of rights arising from the Torco Agreement can only be deemed obstinate. The present case is a textbook example of the need for the independence principle. As explained by the Michigan Court of Appeals, the issuing bank's duty with respect to a letter of credit is "purely ministerial." *Osten Meat Co. v. First of Am. Bank-Southwest Michigan, N.A.*, 517 N.W.2d 742, 745 (Mich. Ct. App. 1994). The bank's representative, who is presumed to know nothing of the parties or the underlying transaction, must merely check the presented documents carefully against the requirements of the letter of credit. "Under a strict compliance standard, if the documents comply, the draft is paid." *Id.* Banks that ignore the independence principle undermine the commercial value of letters of credit and invite litigation, during which the bank attempts, as Chemical Bank does in the present case, to conjure up a defense arising from the underlying contract. "Similarly, such disputes might often end in litigation, further impairing the efficacy of the letter of credit transactions." *Id.* at 476. The only question is whether the beneficiary has complied with the requirements of the letter of credit, not whether the beneficiary has complied with the requirements of the underlying contract.

Judge Maloney has already rejected the precise argument that the bank now attempts to advance. During summary judgment briefing, the bank asserted that the accelerated, future rental payments were not "due and owing" because IMTT had already terminated the contract. Judge

Maloney analyzed and rejected this argument as a violation of the independence principle. (Op., 17-18). The bank seeks to avoid this ruling by pointing out that it had not seen the Agreement at the time the summary judgment motions were briefed. Now that it has seen the Torco Agreement, the bank has learned that the right to terminate and the right to accelerate seem to be in the disjunctive. Although this adds ammunition to the bank's contract-based defense, it does not change the essential nature of that defense -- one based upon the underlying agreement and not the LOC itself. Thus, even if the bank had been given access to the Torco Agreement earlier in the case, the bank would not have been successful in resisting IMTT's motion for summary judgment.

The force of the independence principle is not undermined in the least by the principal case cited by the bank, *Mellon Bank, N.A. v. General Electric Credit Corp.*, 724 F. Supp. 360 (W.D. Pa. 1989), for two reasons. First, and most fundamentally, *Mellon Bank* was not an action by a beneficiary against an issuer for wrongful dishonor. Rather, it was a suit by an issuing bank against the beneficiary for breach of warranty. The *Mellon Bank* court fully acknowledged the independence principle, which prohibits reference to underlying contracts to determine the validity of a draft on a letter of credit. 724 F. Supp. 364-65. The court pointed out, however, that the independence principle applies only to the bank's obligation to honor a draft in the first instance and does not preclude subsequent lawsuit on a theory of breach of warranty. *Id.* at 365. The court went on to find that the beneficiary breached its warranties by asserting that accelerated payments were due when in fact they were not. If anything, the *Mellon Bank* case reinforces IMTT's position in the present litigation. As the present case involves only a beneficiary's claim of wrongful dishonor, the independence principle precludes the bank's reliance on the underlying Agreement.

Second, the *Mellon Bank* case is no longer good law in states, such as Michigan, that have adopted the 1995 Amendments to the U.C.C. *Mellon Bank* was decided under the 1962 version of the U.C.C. Section 5-111(1) of the 1962 U.C.C. provided that a beneficiary presenting a draw on an LOC "warrants to all interested parties that the necessary conditions of the credit have been complied with." U.C.C. § 5-111(1) (1962). *Mellon Bank* construed this language broadly, allowing a breach of warranty claim by the issuing bank against the beneficiary for incorrectly representing that sums were due and owing under the underlying contract. *Mellon Bank* was a controversial decision, even in the Western District of Pennsylvania. Later courts interpreting the 1962 Code in the breach of warranty context expressly rejected *Mellon Bank*, holding that a beneficiary's warranty covered only the genuineness of the documents presented to the issuing bank and did not extend to the truthfulness of the statements in the documents. *See, e.g., Amwest Sur. Ins. Co. v. Republic Nat'l Bank*, 977 F.2d 122, 128-30 (4th Cir. 1992); *PNC Bank, N.A. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 169, 173-74 (W.D. Pa. 1996) (rejecting *Mellon Bank*); *accord* 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 19-12 at 11 (3d ed. supp. 1991) (noting "confusion" and "frightening implications" of *Mellon Bank* rule). In the 1995 version of the U.C.C., the warranty language was removed from section 5-111(1) and a far more limited warranty was included in section 5-110. As amended, section 5-110 provides that *if* a presentation is honored, the beneficiary warrants to the issuer that there is "no fraud or forgery of the kind described in section 5-109(1)." MICH. COMP. LAWS § 440.5110(1). Michigan adopted the 1995 Amendments in Act 488 of P.A. 1998, effective January 4, 1999. It is universally understood that the 1995 Amendments adopted the position contrary to *Mellon Bank*. 1 JOHN F. DOLAN, THE LAW OF LETTERS OF CREDIT ¶ 6.07[4] at 6-142 (4th ed. 2007). Thus, even if this were a breach of warranty case (which it is not), *Mellon*

*Bank* would be of no avail to Chemical Bank, as breach of warranty under the 1995 Code is limited to egregious cases of fraud in the presenting documents, and does not extend to defenses arising from the underlying contract.

The LOC issued by Chemical Bank in 2007 was subject to the 1995 version of the U.C.C., as adopted by Michigan in 1998. That version of the U.C.C. makes it clear, beyond any reasonable doubt, that a bank dishonoring a letter of credit has no claim for breach of warranty. U.C.C. § 5-110 creates a warranty only *if* the presentation is honored. MICH. COMP. LAWS § 440.5110(1). The commentary makes it clear that this provision was specifically designed to prevent issuers (such as Chemical Bank) from relying on an alleged breach of warranty as a reason for dishonoring an LOC: "Since the warranties in subsection (a) are not given unless a letter of credit has been honored, no breach of warranty under this subsection can be a defense to dishonor by the issuer." *Id.* cmt. 1. Again, the rule goes to the very heart and utility of a letter of credit:

> Note first that no warranty is given unless the presentation is honored. This is critical, for it prohibits the warranty from being used as a defense by an issuer who has not honored or by an applicant when the issuer has failed to honor. This makes sense, as the availability of warranties as a defense would undermine the certainty of payment and would degrade the independence of the letter of credit. If the issuer dishonors, no warranties are given under 5-110(a). *Neither the issuer nor the applicant may defend the issuer's dishonor on the ground the beneficiary broke a warranty in its presentation.*

3 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 26-7 at 189 (emphasis added). Chemical Bank has raised no non-frivolous argument that would allow the court to deprive IMTT of full recovery in the amount of $200,000.00 under LOC 2007-19.

### C. Computation of Damages

IMTT is entitled to recover $200,000.00, plus pre-judgment interest under Michigan law pursuant to Mich. Comp. Laws § 600.6013(8). In its interest calculation sheet (docket # 60-2), IMTT improperly terminated the accrual of pre-judgment interest on October 5, 2009 (the date of Judge Maloney's summary judgment opinion and order) and calculated post-judgment interest thereafter. Final judgment, however, has not yet been entered. Post-judgment interest under 28 U.S.C. § 1961 runs only from a final, appealable judgment. *See Scotts Co. v. Central Garden & Pet Co.*, 403 F.3d 781, 792-93 (6th Cir. 2005); *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 990-91 (9th Cir. 2001). It does not being to run at the time of a jury verdict, summary judgment entry, or other interlocutory event that merely establishes liability. *See Kaiser Alum. & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990). Plaintiff is therefore entitled to pre-judgment interest until a final, appealable judgment is entered by Judge Maloney. The post-judgment rate will begin to accrue only upon entry of final judgment.

The attached schedule computes pre-judgment interest on the principal amount of $200,000.00, through April 30, 2010. This amount is $12,768.47. Interest accrues thereafter at $19.75 per day until July 1, 2010, at which time the rate will change again.

### Recommended Disposition

For the foregoing reasons, I recommend that (1) defendant not be granted leave to assert a mitigation defense and (2) judgment be entered in favor of plaintiff and against defendant in the principal amount of $200,000.00, with pre-judgment interest awarded under Michigan law at the rate

prescribed by Mich. Comp. Laws § 600.6013, and post-judgment interest at the federal statutory rate under 28 U.S.C. § 1961 after the entry of judgment.


Dated:  April 29, 2010          /s/  Joseph G. Scoville
                                United States Magistrate Judge


### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).